Hume v. Brelsford.

---

W. J. HUME, Appellant, v. Z. B. BRELSFORD, Respondent. *

St. Louis Court of Appeals, December 6, 1892.

Practice, Appellate: JUDGMENT FOR RIGHT PARTY: NON-PREJUDICIAL ERROR. The evidence in this cause is reviewed, and *held* insufficient to support the action of the plaintiff for damages for deceit. The judgment of the trial court is, therefore, affirmed, as being for the right party, regardless of intervening errors, which are *held* to have been non-prejudicial.

*Appeal from the Pike Circuit Court.*—HON. E. M. HUGHES, Judge.

AFFIRMED.

*Clark & Dempsey* and *J. D. Hostetter*, for appellant.

*Joseph Tapley* and *John Ferrell*, for respondent.

THOMPSON, J.—This is an action for damages for deceit. A trial before a jury resulted in a verdict and

---

*A proceeding by attachment auxiliary to this cause was also taken to this court, and the judgment therein was affirmed in consequence of the affirmance of the judgment in the above opinion.

judgment for the defendant, from which the plaintiff prosecutes this appeal.

In order to a proper disposition of the appeal, it seems necessary to set out the pleadings. The petition states that, in the year 1891, the plaintiff traded and delivered to the defendant a stock of groceries, then owned by the plaintiff and situated in the town of Bowling Green, Missouri, and being of the value of $1,509, for certain real estate (describing it), situated in the town of Beloit, in Lyon county, Iowa; that, in the negotiations resulting in the exchange, the defendant falsely, fraudulently, and with the purpose and design of misleading the plaintiff, represented that said lots were situated in a town containing five hundred inhabitants on the Chicago, Milwaukee & St. Paul railroad near the postoffice, and two or two and a half blocks from the depot; and that there was a good farming country all around said town of Beloit, and that it was well settled up; and that said town, in which said property was located, contained good waterpower, grist mills, bridges and other modern improvements and advantages, and that there were located on said lots two frame storerooms, side by side, having been built seven or eight years, with good glass fronts, good counters and shelves, and in good repair, except a little needed repair on gutter between the roofs; and that said property was worth and could be sold for the sum of $2,000; and that the rental value of said property was $25 per month, or more; and that said buildings were at that time rented to reliable tenants at the sum of $25 per month, which defendant claimed to be receiving. The petition further states that the defendant further falsely represented to the plaintiff that the defendant would only collect the rent from the tenants occupying said property until the first day of January, 1891, and that the plaintiff could, therefore, collect said

rents from and after said January 1, 1891, at the same rate the defendant claimed to be renting it for, to-wit, the sum of $25 per month; that, in addition to making said false and fraudulent representations, as above stated, concerning the character, location, condition, market value and rental value of said property, defendant exhibited to plaintiff letters and postal cards purporting to have been written by parties acquainted with said property, to aid in deceiving plaintiff, and to induce him to trade for said property, defendant at the time representing that the facts and statements contained in said letters and postal cards relating to said property were true; that plaintiff, relying on the representations of defendant as set out above, and misled and deceived by defendant's apparent truthfulness and sincerity, traded and exchanged said stock of goods as aforesaid to defendant for said lots; and that the representations made by defendant to plaintiff, when negotiating said trade, were untrue and were known to be untrue by defendant at the time; that in point of fact the town, in which said property traded to plaintiff by defendant is situated, contains not more than one hundred and fifty inhabitants; that said buildings are badly out of repair, and, in their condition at the time the same were traded to plaintiff, unfit to be occupied as a business house by reason thereof; and that in point of fact, instead of said buildings being rented out at $25 per month at the time of said trade, they were then vacant and unoccupied and had been for nearly a year prior thereto, and that defendant never received any rent therefor, as he fraudulently and falsely represented. Plaintiff further says that said property could not be sold for more than $500, that being the limit of its value, instead of $2,000 as represented by defendant; and that defendant assured plaintiff that the title to the same was good, and agreed to warrant and defend the

title to the same. And plaintiff says that such representations were false, and known to be false by defendant at the time, and in point of fact the title is defective. Plaintiff says that by reason of defendant's false and deceitful representations as to the material facts relating to said property, and relying on the truth of the same, he traded his said stock of goods for said Iowa property as above said; and that, by reason of defendant's said false and fraudulent representations in relation to the said property, he has sustained damages in the sum of $1,000, for which he prays judgment.

The answer denies each and every allegation of the petition not hereinafter admitted to be true; and then proceeds to state that it is true that the defendant traded some property in Beloit, Iowa, to the plaintiff for a grocery store in the city of Bowling Green, in Missouri, and executed his warranty deed for the same; but he denies that he made any false, fraudulent or deceitful representations in regard to the title or the rental of said property.

The plaintiff's evidence in regard to the representations made by the defendant, which induced the plaintiff to make the trade, was substantially as follows: "We had some informal conversation about the matter, when defendant presented me with the following written documents, and stated to me that they contained a true statement of the facts concerning his Iowa property which he proposed to trade to me, to-wit: A United States postal card having the following written thereon:

"'DEAR SIR:—Can help you all O. K. I wrote Mr. Betts about renting the property. Could sell it for $2,000 on time. Needs a little repairing on the gutter between the roofs.            Yours,

"'D. J. CARPENTER.'"

This postal was dated at Beloit, Iowa, December 26, 1890, and was addressed to the defendant at Bow-

ling Green, Pike county, Missouri. Also a certain other document, in words and figures as follows:

"Description of buildings, two storerooms, side by side, framed together, built seven or eight years ago, frame good, glass front, good counters, shelves, in a so-called, five-hundred-inhabitant town, on the Chicago, Milwaukee & St. Paul railroad, near post-office, two or two and one-half blocks from depot. Good farming country all around, and well settled up. Size rooms twenty-two by seventy, on two twenty-five by one hundred and sixty-foot lots. Good waterpower, grist mill, excellent waterpower advantages; also bridge across stream, this seven or eight miles either way. I think I have given all the points. Rented at $25 per month. I was offered more after I rented. Lease has five or six months to run.

"C. N. Ross."

The plaintiff further testified that, relying on the statements of the defendant that these writings were correct and true, he made the trade with the defendant; that, a few hours after he made the trade, he found out through Mr. Bayse that there was something wrong about the Iowa property. He then went to the defendant and tried to get him to let the proceeds of sales of goods be put in a bank, or be held by Robert Spears, until he could find out what the facts in relation to the matter were; but the defendant refused to do either. He then went to Iowa some time in April, 1891, and found that all of the representations made by defendant were false. Defendant had no title to the property. It was a little town containing not more than one hundred and fifty inhabitants. The property had very little or no value. The plaintiff also testified that, on the morning of his first talk with the defendant, he called J. D. Frier as a witness to the trade; that Mr.

Frier came to where the plaintiff was in the store; that the defendant was near and within hearing; that the plaintiff said: "Mr. Frier I have traded my stock of groceries to Mr. Brelsford [the defendant] for some property in Iowa, upon Mr. Brelsford's statement that the facts contained in this postal card and paper in relation to the Iowa property are true; and we want you to mark these papers, so you can identify them if any trouble should arise." Mr. Frier marked the postal card and paper with a "J." Mr. Brelsford was present when he did so, and made no comments or statements.

On cross-examination the plaintiff, among other things, admitted that he had never seen the property, and did not know of his own knowledge what condition it was in. He did not go to Beloit, though he went to the county seat to examine the records. "When Brelsford gave me the postal and the paper, he said: 'That is a description of the property so far as I know; that is all I know about it, as I have never seen the property.' He did not say whom he got them from. He did not say the letter was a copy. He said the statements in the letter were true, so far as he knew. He said he knew nothing more about the property than what the letter or paper stated, and would make me a warranty deed to the property. The trade was made on the eighth day of January, 1891. The deed was passed, and I delivered possession of the stock of groceries to the defendant on the ninth. There was a written contract drawn up between us in relation to this trade on the eighth of January and signed by both of us." Then the plaintiff admitted that the contract had been delivered to Mr. Spears, and that he had procured it from Mr. Spears and destroyed it, "because the trade was consummated;" but he nevertheless kept the

postal card and letter, "because they were valuable to him."

Further on in his cross-examination the following colloquium took place: "*Q.* I will ask you, Mr. Hume, if you did not come back on Saturday, and tell Mr. Brelsford that you were perfectly satisfied with the trade, and did not you show Mr. Brelsford in the abstract, or a note on the back of the abstract, where Mr. Carpenter had given an $8,000 bond for settling up the Carpenter estate, and Brelsford did not know anything about this until you showed it to him, and you said that, if Carpenter was responsible, you were satisfied? *A.* I said, if Carpenter was responsible, I was satisfied. I do not know whether or not he is responsible. The title is the principal thing. If I have a good title, and the property is as represented, I am satisfied. I did not know whether the property is as represented or not, as I have never seen it. I examined the records, and found the property had been sold to pay the debts of old man Carpenter. I do not know whether Brelsford's grantor bought it or not. I do not know the date of the sale of this property."

Mr. J. D. Frier corroborated the statement of the plaintiff that the plaintiff had delivered to him the postal card and paper mentioned in the plaintiff's evidence as above recited, and that the witness had marked them with the letter "J." "Mr. Hume said: 'I have traded for this property with the understanding that these representations are true.' Brelsford was present; he made no reply, but my impression is he assented."

Mr. Walter Basye, on behalf of the plaintiff, testified that he was a notary public; that on the evening of January 8, 1891, the day the trade was made between the plaintiff and defendant, the defendant came to him and wanted him to go down to his farm,

and take his wife's acknowledgment to a deed conveying his Iowa property to the plaintiff. "He said he wanted it done that evening before Hume [the plaintiff] could write or telegraph to Iowa to find anything about the property."

The warranty deed executed by the defendant to the plaintiff, conveying to the plaintiff the Iowa property in pursuance of the contract, was offered in evidence, but was excluded by the court on the objection of the defendant, the plaintiff excepting. The record does not disclose the ground of the objection. The plaintiff offered in evidence the deposition of J. M. Parsons, an attorney-at-law, thirty-three years of age, who had practiced in Iowa for eleven years, and whose residence was at Rock Rapids, in Lyon county, Iowa. He testified at length concerning the laws of Iowa in regard to the liability of the land of a deceased person for his debts, and also in regard to the condition of the estate of James A. Carpenter, deceased, from whom the defendant appears to have derived his title through a deed of D. J. Carpenter, son and executor of the deceased. This deposition was taken on the fourth of March, 1892, and the witnesses testified that, although a proceeding had been commenced to sell the property for the debts of the deceased, a sale had not yet been had. This deposition was objected to *en masse* by the defendant, but for what reason the record does not disclose, and the court sustained the objection, the plaintiff excepting.

The plaintiff next offered in evidence the deposition of J. W. Brennan, a farmer living at Beloit, Iowa, who testified touching the selling and rental value of the property in question at the date of the trade. He testified that the building consisted of one double, frame store building, one story in height; that the selling value would not exceed $500; that the rental value

would be about $10 to $15 per month, provided it could be rented at all; that the prospect of renting it would not be very good, there being four storerooms in the town and only one store; and, as there had been but one store in the town for the past eight years, the lowest bidder on rent would get the tenant. He testified that the average rental of such a building would not exceed $50 per annum, the chances being that it would be used half the time. The population of the town at the date of the trade was about one hundred and fifty. There had been no sales of property in and around Beloit, with the exception of bluff land, for eight years. He added: "I have appraised, as appraiser, two-thirds of the town, lots being from $2.50 to $5 each, and as to rents will say, don't think there has been any in the town for eight years, except perhaps D. J. Carpenter has paid $5 per month for his storeroom."

This was all the evidence offered by the plaintiff; and the defendant in his own behalf testified that, in talking to the plaintiff about the Iowa property, he told the plaintiff he knew nothing about it. "I never saw it, and all I know about it was what was said on the postal and in the letter, and I did not know whether that was true or not. I told Basye, the notary public, I wanted him to take my wife's acknowledgment, as she was not very well and I wanted to save her a trip to Bowling Green the next morning." In his cross-examination he gave as a reason, why he was in a hurry to have his wife's acknowledgment taken, "that the contract was signed and the trade made, but Hume was in possession of the store, and was selling stock and putting the money in his pocket, and would continue to do so until he got my deed. That was the cause of my hurry." He also testified: "My wife and I went to Mr. Hume's store in the morning of the ninth of January. There were several in the store. I gave Mr.

Hume my deed to the Iowa property, and the deed and abstract I had received from Ross thereto. Mr. Hume went and sat down, and called for the letter and postal. (It will be remembered that this so-called letter is the description of the property signed by C. N. Ross, already quoted.) I had to search for the letter. My wife found it in my overcoat, which was hanging up some distance from where Mr. Hume was. Hume called Frier to put mark on letter and postal, so that he could identify them. I did not hear Mr. Hume say anything about trading on the representations contained in the letter and postal. Dawson and Spears were in the store, five, six or seven feet away. I agreed that Hume was to get the rent from the first of January, as that was the time my rent was to commence under my contract with Ross. I got the property on the twenty-seventh day of October from Ross. I told Hume I had never received any rent from the property. Hume wanted me afterwards to deposit the money received from sales, until he could find out whether the Iowa property was all right. I declined to do this, but offered to close up store and go up there with him and see about it, if he would pay expenses. The letter I received from Betts did not come to hand until after the trade was made. I received the Betts letter on Saturday, and the trade had been made and the deeds passed the day previous. I did not trade the property on the representations contained in the letter and postal." On cross-examination, the defendant added: "When I traded with Hume, he represented the grocery stock as worth from $1,500 to $1,800, and he immediately afterwards advised Hugh Edwards not to give me over $800 for it; and, upon the heels of all this, I got the Betts letter saying that the (Iowa) property might be sold on time for $2,000, and showed it to Mr. Hume. That is what made me say I was sick."

Robert Spears testified for the defendant that he was clerking for the plaintiff, and was present when the trade was made. "In speaking of the Iowa property I heard Mr. Brelsford say he knew no more about it than he did about the stock he was trading for; he had never seen it. I did not hear Mr. Hume ask Brelsford if he traded the property on the representations contained in the letter. There was a written contract between them in relation to the trade. They gave it to me for safe keeping. Some time after Mr. Hume asked me to let him see the contract. I did so, and he destroyed it. I had made a copy of it, for fear of accident to it. This is a copy of the contract:

"'BOWLING GREEN, Mo., Jan. 8, '91.

"'I, Z. B. Brelsford, of the county of Pike and state of Missouri, hereby agree to buy the entire stock of goods and fixtures now in the rooms of the Hume Milling Company, number 106 east side of the square in Bowling Green; the consideration being my two business rooms and two lots, numbers 6 and 7, block 25, in the town of Beloit, Lyon county, Iowa, to which I agree to make a general warranty deed to said W. J. Hume. Possession of property in Iowa to be given on January 9, 1891, and to receive possession of said stock of goods on same date. This stock embraces all goods and fixtures in the house belonging to the said Hume. Said Brelsford to assume the rents and insurance on said house and stock of merchandise."

This contract was signed by the plaintiff and also by the defendant.

Robert Brelsford, a brother of the defendant, testified that he was in the store on the Saturday following the trade, and saw the defendant show the plaintiff a letter, and heard the defendant state that Mr. Betts said the Iowa property could be sold for $2,000 on time. "Mr. Hume then showed defendant the abstract

of title to the Iowa property, on which was a note which stated that D. J. Carpenter had given an $8,000 bond, for settling up the Carpenter estate. Mr. Hume stated that he was perfectly satisfied with the trade, for Carpenter's bond would make him responsible. Heard defendant say it looked like the Iowa property was worth $2,000, and Mr. Hume represented the stock of groceries to be worth from $1,500 to $1,800, and that he, Hume, advised Edwards to pay $800 for it. It looked as if he, Brelsford, had gotten the worst of the trade. Mr. Hume stated that was your [Brelsford's] bad luck.''

Mr. J. L. Dawson testified, on behalf of the defendant, that he was present in the store, and about five or six feet from the defendant and plaintiff, when the deed to the Iowa property was delivered to plaintiff, and when the possession of the store was turned over to the defendant, on January 9, 1891. ''Saw defendant deliver to plaintiff the deed and abstract to the Iowa property. After this was done, heard Mr. Hume ask Brelsford for the letter and postal card. Defendant gave Mr. Hume postal card, and his wife found letter in his overcoat pocket, which was hanging some distance away. Brelsford then handed Mr. Hume the letter, and said that was all he knew about the Iowa property, as he had not seen it and did not know anything about it, except what is stated in the letter and postal card. Defendant then turned and went back to where his overcoat was hanging, and put some papers in the pocket. Did not hear Mr. Hume ask Brelsford if he traded the property on the representations made in the letter and postal card.''

It is thus perceived that this is an action for damages, not for a breach of any warranty, but for *fraudulent misrepresentations* as to the title, condition, selling and rental value of the property which the defendant con-

veyed to the plaintiff in exchange for his stock of goods. The action does not proceed on the ground that the trade was made upon the faith of the postal card and letter of Ross, and that defendant agreed to make good the representations therein contained by way of warranty; but it proceeds on the ground that this postal card and this letter were the means by which defendant deceitfully and covinously induced the plaintiff to enter into the contract. It seems plain, on going over the whole evidence, that there was no substantial evidence which would have sustained a recovery, and that the verdict of the jury is for the right party. The plaintiff cut his own case up by the roots by the admissions which he made on cross-examination. This cross-examination, it will be recalled, contained the following statements: "When Brelsford gave me the postal and the paper he said, 'That is a description of the property so far as I know; that is all I know about it, as I have never seen the property.' He said the statements in the letter were true as far as he knew. He said he knew nothing more about the property than what the letter or paper stated, and would make me a warranty deed to the property." The evidence shows that this warranty deed was made and delivered, though the court excluded the deed itself, for what reason we do not know. But, as there was no question about the terms of the deed, its exclusion could not have been prejudicial to the plaintiff. Although the evidence, as exhibited in the bill of exceptions, is evidently taken in narrative form, and is very elliptical, it sufficiently discloses that, on the twenty-seventh day of October, 1890, defendant had bought the property from Ross, and that he had received from Ross or some one else this letter and this postal card concerning the property, and that was all he knew about it; that he exhibited these documents to the plaintiff, telling him that he knew nothing about

the property except what was contained therein, and offered to trade the property for the plaintiff's stock of goods, which offer the plaintiff, without exercising any ordinary business prudence in making independent inquiries about the character and value of the property or the state of the title, eagerly accepted. The statement of Basye, that the defendant told him that he wanted the acknowledgment taken that evening, before Hume could write or telegraph to Iowa to find out anything about the property, raises a bare suspicion that the defendant knew more about the property than he had communicated to the plaintiff, standing, as it does, wholly unconnected with any testimony that the defendant did know more,—and bare suspicion is not enough to support the charge of fraud. It is thus a plain case for the application of the rule of *caveat emptor*. There is nothing in the testimony above set out at length, from which the jury could conclude that the defendant designedly deceived the plaintiff as to the title of the property, or that the defendant did not exhibit to the plaintiff all the information in respect of the property which the defendant himself had. The verdict was, therefore, so clearly the verdict which the jury ought to have rendered, and upon the plaintiff's own evidence, that it is not necessary to consider the instructions given and refused.

It is necessary, however, to consider the propriety of the ruling of the court in excluding the deposition of Mr. Parsons, the attorney, the substance of which has been stated. This deposition, it will be recalled, related chiefly to the state of the law of Iowa in regard to the power to sell, for the payment of the debt of a deceased person, real property of his in the hands of his devisee. We do not at all question the proposition that the law of a foreign state may be proved by the oral testimony of a lawyer of that state, who is an

expert in respect of its laws. But we see no prejudicial error in this ruling, for the reason that, if the entire deposition were admitted, so that the jury should conclude therefrom that the property conveyed by the defendant to the plaintiff was likely to be sold to pay the debts of James A. Carpenter, deceased, the result would be the same. There was no evidence that the defendant made any representations at all to the plaintiff touching the conditions of the estate of James A. Carpenter, deceased. No eviction of the plaintiff had taken place at the time of the trial, and, if an eviction had taken place, the plaintiff would have a remedy on the defendant's deed of warranty. There is nothing in the whole evidence to show that, at the time of the trade, the defendant knew anything more about the title to the property than the plaintiff knew. He delivered to the plaintiff an abstract of the title, and there is no evidence that he knew anything more about the title than what was disclosed by this abstract. Whether in regard of the situation, character and value of the property, or of the state of the title, the evidence is, on the whole, barren of any disclosure that the defendant knew anything more about it than what he disclosed to the plaintiff, or that he did not make a full and fair statement of all that he knew, or that he was guilty of any deceit.

Laying the other questions out of view, we must, therefore, affirm the judgment on the evidence, as being for the right party. It is so ordered. All the judges concur.