RATLIFF BROTHERS, Respondent, v. QUINCY, OMAHA & KANSAS CITY RAILROAD CO., Appellant.

Kansas City Court of Appeals, June 4, 1906.

1. COMMON CARRIERS: Negligence: Contract: Connecting Carriers. A common carrier cannot contract against liability for its own negligence or the negligence of its connecting carrier and must answer for such negligence regardless of such stipulation.

2. ———: ———: Delay: Discrimination: Overloading. The shipper must show the carrier's negligence but it is no defense that the carrier treats the shipper as it did other shippers; and its

failure to supply sufficient trains so as to avoid unreasonable delay by overloading is negligence; and the fact that later trains passed the delayed train raises an inference of negligence.

3. ———: ———: ———: **Overloading: Evidence.** A carrier is presumed to know the character of its road and grades and the capacity of its engines, and the fact that an engine could not draw trains over heavy grades points to careless overloading.

4. ———: ———: **Damage: Evidence.** The evidence relating to notice of damage given by the shipper is reviewed and held to show notice properly given and accepted as full performance of the condition.

5. ———: ———: **Notice: Damages.** A notice of damage given by shipper is held not to confine the recovery of damage to the mere matter of loss in weight but to cover delay and other grounds of damage.

6. ———: **Delivery: Liability: Instructions.** When carrier places cars of stock at the unloading place in position to be unloaded and delivers the billing to the Stock Yards Co., it has performed every act to complete the delivery and is not liable for damages resulting from subsequent delay or the negligence of other parties and an instruction set out in the opinion is approved.

Appeal from Grundy Circuit Court.—*Hon. G. W. Wannemaker,* Judge.

REVERSED AND REMANDED.

*J. G. Trimble* and *Hall & Hall* for appellant.

(1) The written contracts for the shipment of the cattle were the best and only competent evidence of the terms and conditions of the shipment, and the same could not be changed, modified, varied, or added to by any prior or contemporaneous statements or agreements. O'Bryan v. Kinney, 74 Mo. 125; Holloway v. Ry., 62 Mo. App. 53; Turner v. Ry., 20 Mo. App. 632; Ry. v. Cleary, 77 Mo. 634; State ex rel. v. Hoshaw, 98 Mo. 360; Realty Co. v. Moynihan, 179 Mo. 629; Anthony v. Rockfeller, 102 Mo. App. 326; Bank v. Cushman, 66 Mo.

App. 102; Best v. Bank, 101 U. S. 93.   (2)   The trial
court should have excluded the oral evidence as to the
terms and conditions upon which the cattle were shipped
as soon as it became known that there was a written
contract as to the shipment and as soon as the court's
attention was called to it.   Filley v. Talbett, 18 Mo. 416;
Stephens v. Railway, 96 Mo. 207, 214.   (3)   A judgment
will be reversed for the admission of incompetent testi-
mony where it is improbable that an instruction to dis-
regard it failed to remove the impression made by it.
Cobb v. Sand, etc., Co., 12 Mo. App. 130.   This case was
reversed in 87 Mo. 90, but not on this point; Mueller v.
Weitz, 56 Mo. App. 36, 40; Gutweilder's Admr. v. Lack-
mann, 39 Mo. 100; Myers v. Lewis, 42 Mo. App. 417;
420.   (4)   According to the allegations in the petition
and the contracts of shipment read in evidence, the ap-
pellant was only required to carry said cattle to the
Union Stock Yards in Chicago, and the undisputed evi-
dence is that said stock was delivered to the Stock Yards
Company and unloaded by 7 o'clock a. m. of the 17th,
and the court erred in admitting the evidence of the wit-
nesses as to the delay and damages that occurred after
said stock was delivered at said stock yards.   There
were no allegations in the petition to support the same.
Greene v. Gallaher, 35 Mo. 226; Brooks v. Blackwell,
76 Mo. 309; State ex rel. v. Martin, 77 Mo. 675; Kiskad-
don v. Jones, 63 Mo. 190; Hicks v. Railway Co., 68 Mo.
335; Obert v. Dunn 140 Mo. 485; Current v. Railway,
86 Mo. 67; Buddy v. Railway, 20 Mo. App. 206.   (5)
The court erred in refusing to give appellant's instruc-
tion in the nature of a demurrer to the evidence at the
close of plaintiff's testimony, that it was appellant's duty
"to receive all freight and live stock offered for trans-
portation at the place of starting, at the junction of
other roads, and at usual stopping places," and to
take, transport and deliver the same without un-
necessary delay.   R. S. 1899, secs. 1082, 1084.   (6)
The burden of proof was on the plaintiffs to show that

defendant was guilty of the specific negligence charged and the court erred in giving plaintiff's instructions. Witting v. Railway, 101 Mo. 631, 28 Mo. App. 103; Clark v. Railway, 64 Mo. 440; Chemical Co. v. Railroad, 78 Mo. App. 305; Crow v. Railroad, 57 Mo. App. 135; Galm v. Railroad, — Mo. App. — 87 S. W. 1015; Chitty v. Railway, 148 Mo. 75; McManamee v. Railway, 135 Mo. 447; Feary v. Ry., 162 Mo. 96; Lachner Bros. v. Express Co., 72 Mo. App. 17; Waldhier v. Railway, 71 Mo. 514; Bartley v. Railway, 148 Mo. 139; Hite v. Railway, 130 Mo. 132. By the terms of the written contracts between the plaintiffs and J. A. Arnote and the defendant the execution of which was admitted by all parties thereto, it was expressly "agreed that the said railroad company shall in no case be liable for any loss or damage to said animals, unless a claim shall be made in writing by the owner or owners thereof or his or their agent, and delivered to the general freight agent of said railroad company or to the agent of said railroad company at the station from which the animals were shipped, or to the agent at the point of destination, within ten days from the time said animals are removed from the cars." (7) Under these contracts, the plaintiffs, if entitled to recover at all, were only entitled to recover for such loss or damage as claim was made for in writing as required in said contracts. Smith v. Railway, 112 Mo. App. 610, 87 S. W. 9; McBeath v. Railway, 20 Mo. App. 445; Brown v. Railway, 18 Mo. App. 577; Dawson v. Railway, 76 Mo. 514; Thompson v. Railway, 22 Mo. App. 321, 326; Boot & Shoe Co. v. Tel. Co., 49 Mo. App. 99; Crow v. Railway, 87 Mo. App. 135.

*Hugh C. Smith* and *Harber & Knight* for respondents.

(1) From the very start to close of trial in this case, we objected to evidence of written contracts. No such contracts were pleaded. 3 Ency. of Plead. and

Prac., pp. 818-819; Turner v. Railroad, 90 S. W. 391. (2) As to failure of defendant to deliver the four loads of cattle of respondents and one load of Judge Arnote's for early morning market: It would seem useless to take up time with this branch of the case for the reason, as previously suggested in our statement, the jury allowed, as it is apparent, nothing for this failure to deliver all of respondent's cattle, and the one load of Judge Arnote's for the early Monday morning market. (3) These cattle were not delivered on time, they should have arrived the evening before, and under the evidence had damages been allowed, by reason of market decline from morning until afternoon of said 17th day of August, 1903, on such of said cattle not actually received by Evans-Snider-Buel Company until afternoon of said day, such an allowance would have been fully stained by the law. Loeb v. Railway Co., 85 S. W. 118; Chem. Co. v. Railroad, 100 Mo. App. 164; Grain Co. v. Railway, 176 Mo. 840; 5 Thompson's Com. on Law of Negligence, sec. 6620; Rowland v. Miln, 2 Hilt. (N. Y.) 150; Railway v. Warren, 16 Ill. 502; Frand v. Railway, 57 Mo. App. 186; Pindell v. Railway, 34 Mo. App. 683. (4) The burden was perhaps unnecessarily assumed by us, at least after unreasonable delay and rough treatment was shown. Cash v. Railway, 81 Mo. App. 109; Marshall, etc., Co. v. Railway, 105 Mo. App. 562; Hance v. Ex. Co., 48 Mo. App. 179; Hance v. Ex. Co., 66 Mo. App. 486; Ball v. Railway, 83 Mo. 574. (5) When the delay occurred as it did, from being laid out to meet other trains—let other trains pass; from the breaking down of the engine; laying on sidetracks for hours at a time without any apparent cause; from being compelled to "double hills" because of an overloaded engine; or in fact when from all the evidence the delay was apparently unnecessary, defendant must satisfactorily explain it or respond in damages: Ball v. Railway, 83 Mo. 574; Keyes-Marshall Co. v. Railway, 105 Mo. App. 562; Cash v. Railway, 81 Mo. App. 109; McCrary v.

Ratliff Bros. v. Railroad.

Railway, 109 Mo. App. 567; 5 Thompson's Com. on Law of Neg., sec. 6583; Railway v. Heggie, 22 Am. St. 453. (6) Notice was given within the required time and acted upon by the apellant, who accepted it as sufficient. Summers v. Railway, 79 S. W. 483; Live Stock Co. v. Railway, 100 Mo. App. 689.

JOHNSON, J.—Plaintiffs sued to recover damages which they claim resulted from the negligence of defendant, a common carrier, in the transportation of fat cattle to market. In the first count of the petition the cause of action pleaded relates to a shipment of ninety-three head of plaintiffs' cattle received by defendant at Melbourne, Missouri, for delivery at the Union Stock Yards at Chicago. In the second count the cause pleaded relates to a shipment of sixty-three head of cattle made by J. A. Arnote, their owner, from Trenton, Missouri, to the same destination and this cause was assigned to plaintiffs by Mr. Arnote before the bringing of this suit. The shipments were carried by defendant on the same train. No written contracts of affreightment are pleaded. Both causes are grounded in negligence and the acts of negligence pleaded will appear in our statement of the material facts disclosed by the evidence. The answer is a general denial. Plaintiffs had judgment on the first count in the sum of $282.48 and on the second for $231.41, and defendant appealed.

Plaintiffs, farmers and raisers and shippers of live stock in the vicinity of Melbourne, applied to the agent of defendant at that place for four cars in which to ship their ninety-three head of cattle to Chicago and for two cars for a shipment of hogs to the same market. At the same time Mr. Arnote, another farmer and stock shipper, applied to the same agent of defendant for three cars in which to make his shipment of sixty-three head of cattle to Chicago from Trenton. Melbourne is some twelve miles west of Trenton and defendant's road runs eastwardly from that point through Trenton to Quincy, Illi-

nois, where it connects with the Chicago, Burlington and Quincy Railroad running from Quincy to Chicago. The distance from Trenton to Quincy is one hundred and thirty-two miles and from Quincy to Chicago two hundred and sixty-three miles. The shippers advised defendant's agent that they desired to ship their stock on the evening of Saturday, August 15, 1903: to have it unloaded at the railroad stock yards at Quincy for food, water and rest and then forwarded to Chicago in time for the early market on Monday the 17th. First the parties talked of sending the shipments forwarded on a regular mixed train, a passenger train that carried a limited number of freight cars, scheduled to leave Melbourne near midnight, but when the agent learned that the shipments contained nine cars he informed the shippers that the load would be too great for that train and that defendant would furnish them a special train as nine cars would make a full train load owing to the heavy grades on the road. The shippers were satisfied with this proposal and accordingly defendant provided the necessary cars at Melbourne and Trenton. Plaintiffs delivered their stock to defendant loaded in the cars at about 5:30 o'clock in the afternoon of the 15th and shortly thereafter the train departed. At Trenton a delay was encountered in the loading of the Arnote cattle caused by a defective car door and the train did not leave until about 8:30 o'clock that evening. According to the evidence of plaintiffs, the time ordinarily and reasonably consumed in the transportation of live stock from Trenton to Quincy does not exceed eight hours, but this train did not reach the latter place until about noon the following day. The cause of this extraordinary delay is not a matter of dispute. From Milan to Quincy the train was used as a local freight and was stopped at nearly every station to do switching and to entrain other cars of stock and freight, so that before Quincy was reached the train consisted of thirty-five or forty cars. The speed of the train was greatly retarded from this overloading.

At two places long delays were encountered from the inability of the engine to pull the train over long up-grades. At these places the process called "doubling" was executed. That is the rear half of the train was placed on a sidetrack, the engine pulled the front half to the next siding and then returned for the cars left behind. At Lewiston, west of Quincy, the train was passed by the mixed train which left Melbourne some six hours later. On arriving at Quincy, the shippers were told by defendant's yardmaster that they could not unload their stock for food, water and rest and reach Chicago in time for the early market next day. Plaintiffs' witnesses say that the time usually and reasonably required in the carriage of live stock from Quincy to Chicago does not exceed twelve hours and the shippers did not unload as they did not wish to miss the Monday market. They left Quincy at 12:03 p. m. Sunday. From that place to Galesburg, a distance of one hundred miles, their train did local work including switching at various stations, and the stock was very roughly handled. About seven hours were consumed in this run and the train did not reach the stock yards at Chicago until 6:30 Monday morning. All of the stock was consigned to a commission firm employed by the shippers to handle and sell it at the yards. Two cars of the Arnote cattle were delivered at the unloading chutes and were received by the shippers' agent at about seven o'clock in the morning and were sold on the early market, but the remaining car of the Arnote cattle and plaintiffs' four cars were not received by the consignee until noon Monday and, as the market had then declined and really was over for that day and the cattle were very tired and stale, they were not sold until the following day. Plaintiffs say that at various points where switching was done the cars containing the stock were not left standing but were used in switching and in several instances were carelessly handled. As a result the cattle were much bruised and this together with their long confinement in

the cars without food and water caused them to shrink in weight and to become stale and less marketable.

It is plaintiffs' contention that the unusual delays and the rough handling were the direct consequences of defendant's negligence and the resulting loss consists of damage to the quality and condition of the cattle, shrinkage in weight and decline in market value.

Defendant introduced in evidence written shipping contracts under the terms of which it is conceded the shipments were made. They evidence an agreement by defendant to carry the stock from the shipping points to Chicago in consideration of the payment of the freight charges: contain no agreement that the stock is to be delivered in any specified time or for any particular day's market: provide that defendant shall not be liable "for loss or damage after delivery to any connecting line, nor for any loss or damage not incurred upon its own line:" and further provide that defendant "shall in no case be liable for any loss or damage to said animals unless a claim shall be made in writing by the owner or owners thereof, or his or their agents, and delivered to the general freight agent of the said railroad company, or to the agent of said railroad company at the station from which the animals are shipped, or to the agent at the point of destination, within ten days from the time the said animals are removed from the car."

Defendant argues that its demurrer to the evidence should have been sustained and first, we will consider the questions involved in that contention.

Conceding for argument that the verbal negotiations between the shippers and defendant's agent at Melbourne, all of which occurred before the signing of the written contracts, should for that reason be treated as superseded by said contracts; defendant nevertheless must be held liable for damages inflicted by the negligent acts of its connecting carrier as well as for those resulting from its own negligence. It could not contract in

law against liability for its own negligence and in contracting for through shipments to Chicago bound itself to answer to the shippers for the negligence of its connecting carriers regardless of the stipulation to the contrary in the contracts of affreightment.    [Bushnell v. Railroad, 118 Mo. App. 618; Buffington & Lee v. Railroad, 118 Mo. App. 480; Bank v. Railroad, 72 Mo. App. 82; Marshall v. Railroad, 74 Mo. App. 81; Popham v. Barnard, 77 Mo. App. 628; Marshall v. Railroad, 176 Mo. 480; Western Sash & Door Co. v. Railroad, 177 Mo. 641.]

The burden of proof was on plaintiffs to show affirmatively that the delays of which they complain were due to the negligence of the carriers (Bushnell v. Railroad, supra), and this burden has been met fairly.    It may be true that defendant was not required to provide these shippers with a special train for their sole use, nor to deliver their stock in time for any particular market, nor to give them special privileges not enjoyed by others, but, possessing knowledge that the subject of affreightment was fat marketable cattle, a species of property that suffers damage in transportation by rail even when reasonable care is used, defendant as a common carrier was required to exercise reasonable diligence to complete the transportation without delays that could have been avoided by reasonable care.    Defendant appears to think it discharged its duty properly because it gave plaintiffs' stock the same treatment that the stock of other shippers carried on the same train received and that, as it could not under the statute (Revised Statutes 1899, sections 1082 and 1084) discriminate in favor of plaintiffs, it should not be held liable under the showing that it did not discriminate against them.    It will be presumed that defendant knew before these shipments started on their way the amount of other freight received by it at intermediate points for transportation eastward and it is not claimed that its facilities were overtaxed by a sudden, extraordinary and un-

anticipated inrush of business. Reasonable care imposed on it the duty to provide a sufficient number of trains for the proper transaction of its ordinary business and it was negligence for it to overload its train knowingly and thereby unreasonably delay the transportation of property that it must have known would suffer damage by such delay. That the delays were due to overloading is fully demonstrated. Another train that carried freight left the starting point six hours later than the one under discussion and beat it into Quincy showing that the delays were peculiar to the operation of the particular train and not to any sudden and unavoidable interruption of traffic. This fact of itself is enough to raise an inference of negligence. [Anderson v. Railroad, 93 Mo. App. 677; Bushnell v. Railroad, supra.]

The fact that the engine could not draw the train over heavy grades also points to careless overloading. Defendant is presumed to know the character of the grades in its roadway and the capacity of its engines and must have anticipated that the delays encountered would occur.

The evidence of the plaintiffs was sufficient to take the case to the jury on this issue.

Another point urged by defendant is that plaintiffs and Arnote failed to comply with the provision of the written contracts that requires the presentation to the carrier of a written claim for damage within ten days after the unloading of the stock. The failure to perform this condition was not pleaded in the answer as a defense and plaintiffs argue that it should not be regarded as an issue in the case, but passing the determination of that question, we find in the record conclusive evidence of the performance of the condition. Defendants introduced as a witness the live stock agent of the Chicago, Burlington & Quincy Railroad Company, who testified that these claims were referred to him by defendant for investigation on the merits. On cross-examination, the witness said:

"Q. Ratliff and Arnote did make a claim about the 17th to 20th of August for settlement of this matter? A. Yes, sir.

"Q. You know they called upon you for a settlement? A. I got a letter from them and written about the 25th.

"Q. You knew as early as the 25th they were wanting a settlement? A. Yes, sir.

"Q. What is your business? A. Live stock agent for the Burlington.

"Q. And incidentally anything comes over the O. K. (defendant) you look after it? A. Any cars that come over any other road connected with us.

"Q. You would have had charge of this matter? A. I would later had it. It was with the claim department.

"Q. And then referred to you? A. Yes, sir.

"Q. And that was as early as August 25, 1903? A. That's when I got the papers.

"Q. And so the claim must have been made prior to that time? A. Yes, sir."

It thus is made clear by defendant's own evidence that the claims were made in writing by both shippers and received by defendant within the required period: that no objection was made to their sufficiency and that they were considered on their merits and thereby accepted by defendant as a full performance of the condition. [McFall v. Railroad, 117 Mo. App. 477; Bushnell v. Railroad, supra; Hamilton v. Railroad, 80 Mo. App. 597; Summers v. Railroad, 79 S. W. 481; Live Stock Co. v. Railroad, 100 Mo. App. 674.]

In this connection we will consider a question presented by defendant that does not arise under the demurrer to the evidence but relates to the measure of damages recoverable under the first count. Defendant offered in evidence the letter written by plaintiffs to defendant's general freight agent, in which their claim was made, and it is contended that, as the damages therein claimed is that resulting from loss of weight

alone, it was error for the court, as it did in the instructions given, to permit a recovery of other damages. In the letter under consideration, plaintiffs did not itemize their damages, but after recounting the facts constituting the ground of complaint stated that, "We had a very heavy shrink and will expect you people to compensate for same. This I very much regret, as I secured three loads from a Mr. Arnote to go in connection with my eight loads and this treatment has caused him to feel very sore at you people, and would advise that you send your claim agent as early as possible to heal up the wounds." The objection is based on defendant's interpretation of the words "a very heavy shrink." To say that the term refers only to loss of weight is to place a meaning upon it obviously not justified by the context. Complaint is made of the various delays; of the rough treatment the cattle received. "In one instance they used our cattle in such a way that I think at one time they knocked all down in one car." And of the delay in delivering five of the cars at the unloading chutes, which caused the cattle in those cars to reach the yards too late to be sold on Monday's market. In the light of these circumstances the writer of the letter evidently intended in the words before us to claim compensation for the loss in value of the cattle caused by the negligent acts of the carriers and the constituent elements of this loss, i. e., depreciation on account of loss in weight, injury to quality and decline in the market were sufficiently suggested to notify defendant of the real scope of the claim presented.

The views expressed dispose of the demurrer to the evidence adversely to the contentions of defendant.

Defendant asked and the court refused to give the following instruction: "The court instructs the jury that defendant was not required to deliver the stock mentioned in plaintiff's petition to Evans-Snider-Buel Commission Company, but its full duty was performed when it carried said stock to the unloading platforms

in the Union Stock Yards in the city of Chicago, and it is not responsible for the delay, if any there were, in the unloading thereof by the Stock Yards Company, nor is it liable for the delay, if any there were, occasioned by the failure of the said commission company to take said stock from the unloading chutes, or the action of the Stock Yards Company in putting said stock in pens, and plaintiffs cannot recover anything from this defendant on account of loss, if any there were, by reason of the lapse of time between the arrival of the train carrying the stock at the Union Stock Yards and the arrival of the stock at the selling pens of the commission company."

The Evans-Snider-Buel Commission Company was the consignee of the shipments and the agent of the shippers. It is conceded that the proper place for the unloading of cars of cattle so consigned was at the unloading platforms of the Stock Yards Company known as numbers five and six. Defendant's witnesses say that all of the seven cars were delivered at these platforms at seven o'clock in the morning in position to be unloaded and the waybills were at that time delivered by the conductor of the train to the proper officer of the Stock Yards Company. This, under the custom followed at the yards, constituted a delivery of the stock by the carrier to the Stock Yards Company and the consignee, if present, had the right to receive the stock there and have it taken to the proper pens. If the consignee was not present, the Stock Yards Company posted a notice of the arrival of the stock on a bulletin board provided for that purpose. It is not shown by plaintiffs that any representative of the consignee was present when the cars were delivered at these platforms, but their witnesses state that the consignee went to the platforms before eight o'clock and found only two of the cars there. Later in the morning at about ten o'clock a witness for plaintiffs went with an employee of the consignee to

the platforms to find the five missing cars, but without success. They also looked at the bulletin board and ascertained that the arrival of these cars was not posted. The five cars were not received by the consignee until about noon.

Recently we said in the case of Russell Grain Co. v. Railroad, 114 Mo. App. 488, 89 S. W. 908; "It is the duty of the common carrier not only to safely carry property to its destination, but to take it to the place provided at that point for delivery to consignees of property of its kind and there place it in a position of accessibility." [Loeb v. Railroad, 85 S. W. 118.] There is a sharp conflict between the witnesses of the respective parties respecting the time of the performance of this duty that raised an issue of fact for the jury, the determination of which under proper instructions would solve the question of whose negligence was responsible for the delay in question.

When the carrier placed the cars at the unloading platforms in a position to be unloaded and delivered the billing to the Stock Yards Company, it performed every act required of it as a carrier to complete the delivery and defendant is not liable for damages that resulted from a subsequent delay caused either by the failure of the Stock Yards Company to post on the bulletin board the arrival of the stock or of the consignee to receive it promptly. Both shippers and their consignee had actual knowledge of the arrival of the shipments at the stock yards and therefore should have gone without notice, as they say they did, to the regular place of delivery to receive the property. The instruction under consideration correctly declared the law and it was error to refuse it. There is no merit in the argument of plaintiffs that the verdict shows the jury allowed nothing for loss on account of the decline in the market and that as the cattle in the cars in question were the only ones that suffered damage from this cause, the error in refusing the instruction was harmless. We

have no means of knowing whether the jury excluded this element of damage, but, assuming that it did, the verdict certainly included damages resulting from shrinkage in weight and injury to quality caused by delay and some of this injury must have been inflicted during the delay under consideration. The error cannot be said to have been harmless.

The judgment is reversed and the cause remanded. All concur.