101 LIVE STOCK COMPANY, Respondents, v. KANSAS CITY, MEMPHIS & BIRMINGHAM RAILWAY COMPANY, Appellant.

Kansas City Court of Appeals, June 8, 1903.

1. **Common Carriers:** DELAYED SHIPMENT: EVIDENCE: DEMURRER. The evidence relating to negligence in delivering a certain shipment of cattle to the connecting carrier is held sufficient to send the question to the jury.

2. ———: CUSTOM: NOTICE. Certain instructions are held to have required the jury to believe that notice of a custom relating to the delivery of waybills was brought home to the defendant.

3. ———: WAYBILLS: DELIVERY TO CONNECTING CARRIER. Though a carrier furnish information to the connecting carrier which would enable the latter's agents to properly bill the shipment, which they refused to do, the former is at fault where the rule requires regular waybills which are not tendered, and there is no delivery to the connecting carrier.

4. ———: DELIVERY TO CONNECTING CARRIER: SHIPPER'S CONSENT: INSTRUCTIONS: EVIDENCE. In the absence of evidence showing that the shipper was required to consent to the delivery of the shipment to a connecting carrier, an instruction requiring such consent is without evidence to support it.

5. ———: DIFFERENCE IN DESTINATION: CONDITION. Where the destination of a shipment of cattle is changed for only a few miles the fact that an instruction requires the jury to ascertain the condition of the cattle at the new destination is immaterial and nonprejudicial.

6. ———: LIMITING DAMAGES: CONSIDERATION. A stipulation limiting the value of the goods shipped in case of loss does not bind the shipper unless based on a consideration, and the place of fixing the value of the shipped goods is the place of delivery.

7. ———: COMPUTING LOSS: DELAYED SHIPMENT. A stipulation requiring the loss to be computed at the time and place of shipment does not apply to damages occurring from failure to deliver in a reasonable time, but to injury arising during the shipment.

8. ———: DELAYED SHIPMENT: LOST GOODS: MEASURE OF DAMAGES: INSTRUCTION. An instruction authorizing the jury to compute the plaintiff's damages for cattle lost at their value at their destination and the time of their arrival, is erroneous.

9. ———: LOSS: NOTICE: DENIAL OF LIABILITY. A contract of shipment required the shipper in case of loss to give notice at the destination in order that an investigation thereof might be had. The shipper gave a notice, the company denied all liability and refused to investigate. *Held*, that no notice was necessary, and the insufficiency of the notice given was immaterial.

10. ———: FEEDING AND WATERING STOCK. Though a contract of shipment required the shipper to feed and water his own stock, the carrier must furnish a proper place and facilities and reasonable opportunity for so doing; and if he undertakes to perform the duty of feeding and watering without the shipper's consent he is liable for all damages arising from his negligence.

11. Appellate Practice: ABSTRACT. The abstract in this case is held to be sufficient since the case of Reno v. Fitz Jarrell, 163 Mo. 411, and like cases do not govern as ruled in State ex rel. v. Smith, 176 Mo. 44.

Appeal from Jackson Circuit Court.—*Hon. W. B. Teasdale,* Judge.

REVERSED AND REMANDED.

STATEMENT BY BROADDUS, J.

This is a suit by the 101 Live Stock Company against the Kansas City, Memphis and Birmingham Railroad Company for delay of a shipment of stock at Memphis, Tennessee, and for a failure to properly feed, water and take care of said stock on the part of the Union Stock Yards Company at Memphis, Tennessee, into whose hands they were placed by the railroad company while waiting further orders, and to comply with the Federal statutes in regard to watering and feeding stock in transit. There were three counts in plaintiff's second amended petition. At the trial plaintiff dismissed as to the first and third counts of the petition and stood upon the second count, which alleged: That defendant was a railroad corporation and a common carrier between Birmingham and Memphis; that on the 5th day of June, 1898, at 7 o'clock a. m., at Birmingham, defendant received 361 head of cattle to transport to Memphis, Tennessee, and there deliver to a connecting line, the St. Louis, Iron Mountain and Southern Railway Company, for further transportation to White Eagle, Oklahoma; that at said time and for a long time prior thereto there was and had been a custom on the part of said last-named railway not to receive any cattle unless the same was accompanied by regular way-bills or expense vouchers showing weight of shipment and freight charges thereon, and advanced and back charges and expenses of such shipment up to Memphis; that this was well known to defendant; that at the time defendant received the cattle at Birmingham, defendant failed and neglected to procure, provide or make out said regular billing, failed to inform plaintiff of the rule exacted by the St. Louis, Iron Mountain & Southern Railway Company, aforesaid, as to such waybills or expense vouchers and failed to notify plaintiff that it would be unable to deliver said cattle in a reasonable time; that by reason of said negligence or carelessness

defendant did not and could not deliver said cattle to the said St. Louis, Iron Mountain & Southern Railway Company, in a reasonable time, and not until twenty-four hours had elapsed; that during said delay defendant, against the protest of plaintiff, caused said cattle to be unloaded in stock pens or yards wholly unfit for the proper care of said cattle, where said cattle were not properly watered or fed or cared for; that by reason thereof plaintiff was compelled to pay $60 for feed and stock yard charges, $16 for switching charges, was compelled to make to stops *en route* instead of one; that 41 head of cattle sickened and died and the remaining 320 head became sick and shrunk in weight, all to plaintiff's damage in the sum of $1,500.

The evidence was somewhat conflicting. However, on the part of plaintiff it tended to show the following facts, viz.:

That plaintiff was engaged in the cattle business in Oklahoma Territory; that in the spring of 1898, through its agent, one Z. T. Miller, it bought and shipped from Salem, Alabama, 361 head of cattle to White Eagle, in said Territory; that they were billed from Selma over the Western railroad to Montgomery, from Montgomery to Birmingham over the Louisville & Nashville railroad, and from Birmingham to Memphis over the defendant railroad, from Memphis over the Iron Mountain railroad to Coffeyville, from Coffeyville to their destination over the Santa Fe railroad; that they were loaded at Selma in eight cars at 9 o'clock p. m., Saturday, June 4; that Miller, plaintiff's agent, accompanied the cattle, and that they arrived at Montgomery at about midnight the same day; that the L. & N. railroad then took charge of them and delivered them at Birmingham at about 5 o'clock a. m., Sunday, June 5; and that at Montgomery nine other carloads of cattle belonging to parties by the name of Rogers were attached to the train, so that when it arrived at Birmingham the train consisted of seventeen carloads of cattle. Plaintiff's

evidence tended to show that Miller had nothing to do with the Rogers cattle, while that of defendant tended to show that he did.

At Birmingham the L. & N. railroad turned the cattle over to the defendant, and new contracts were entered into between Miller, plaintiff's agent, and the defendant, by which the latter agreed to carry and deliver them to the Iron Mountain railroad at Memphis. The train composed of the seventeen carloads of cattle left Birmingham at about 6 o'clock a. m., June 5, and arrived over defendant's road at Memphis at about 5 o'clock p. m. of the same day. Plaintiff's cattle had been billed in the care of the Iron Mountain Railroad at Memphis, the connecting line which was to carry them from that point to Coffeyville, Kansas, under an arrangement with the Iron Mountain agent by Miller before leaving Selma. The evidence further tended to show that it was Miller's intention to stop at Little Rock, Arkansas, a station on the Iron Mountain railroad, to rest, water and feed the cattle in compliance with the act of Congress prohibiting shippers and railroads from confining cattle in cars longer than twenty-eight hours without unloading them for feed, water and rest; that the distance from Memphis to Little Rock was one hundred and fifty miles, and that the cattle could have arrived at said last named place within twenty-eight hours if defendant had promptly delivered them to the connecting line. Miller gave as his reason for wanting to unload and feed at Little Rock instead of Memphis, that the run from that place to White Eagle could have been accomplished in twenty-four hours, so that only one stop for feed, water and rest would have been necessary for the entire journey, which would save the expense of two stops on the road for said purpose, whereas it would have required more than twenty-eight hours to have made the distance from Memphis to White Eagle, requiring two stops and with added expense.

Miller had telegraphed ahead to the Iron Mountain agent at Memphis that the cattle were on the way, and when they arrived at Memphis said road was ready with an engine and train crew to start on the journey at once with them. There was evidence tending to show that when the cattle got to Memphis the cars containing them were set upon what was known as the transfer track and the defendant's agent went to the office of the Iron Mountain railroad, informed its agent that he had no billings covering plaintiff's cattle and that all he did have was a memorandum called a "slip billing" or a "billing with weight and charges to follow." The Iron Mountain road refused to accept the cattle unless accompanied with a regular shipping bill containing weights, charges, destination and other necessary information for forwarding freight of the kind. Whereupon the defendant's agent sent the cattle to the stock yards for the purpose of unloading them. To this, Miller objected, at which time, according to his testimony, defendant's agent said to him that they would do as they pleased with them. Miller stated that he insisted on having the cattle proceed to Little Rock where he intended to feed, and offered to pay the freight and in addition $5 more per car than the regular tariff rate; but the agent not having the billing could not furnish the amount of charges, and refused his offer; that he then asked the agent to ascertain by telegram the amount of the charges, but the agent refused to do so; that he, himself, sent a telegram to defendant's general freight agent at Kansas City, Missouri, asking him to guarantee to the Iron Mountain road that the freight charges would not exceed the amount he had paid on a prior shipment, to which he received no answer. The defendant unloaded the cattle in the stock yards. There was evidence that these yards were in bad condition and unfit for the proper care of cattle, and that they were not properly fed and watered; that the cattle were fresh from grass and would not eat the cotton seed hulls given

them until they were starved into doing so; that Miller demanded hay, but there was none; that he made an effort to get water for the cattle, and asked for the key to the water box, and was told that it was lost; that as a result of the condition of the stock yards and treatment of the cattle while there, the plaintiff lost six of them; and that the remainder became weak and feverish and sick, and began to get down in the cars.

The delayed waybills arrived at Memphis at 6 o'clock p. m., when the cattle were reloaded. They reached Coffeyville at about 9 o'clock p. m., June 7, where a stop was made, the twenty-eight hour limit having expired, and they were rested and fed.

At Coffeyville the billing was changed from White Eagle to Bliss, a place claimed to be more convenient for unloading. They arrived at Bliss at about 9 o'clock p. m., where, when they were unloaded from the cars, it is claimed that they stampeded and got beyond the control of those in charge of them and rushed to a pond, where many of them drank too much water and were foundered. There was evidence going to show that within thirty-six hours after they were unloaded sixteen of them had died, and that within ten days forty-one had died; and that the others did not recover their health before the expiration of two months.

There was evidence tending to show the amount of damages sustained. A letter from Miller to Mr. Riddle, defendant's general freight agent at Kansas City, was in evidence, in which he stated plaintiff's damage in the total was $479.50; but this statement only referred to five dead cattle. His explanation was that his only purpose in writing said letter was to give defendant's agent an opportunity to visit the cattle ranch to see the cattle and investigate his claim. Said Riddle acknowledged receipt of Miller's letter notifying him of the loss of and damage to the plaintiff's cattle, but he declined to investigate the matter and denied all liability therefor. There was evidence showing that the way-

bills in question were in the office of the Louisville & Nashville railroad at Birmingham at the time plaintiff's cattle were shipped over defendant's railroad, but that defendant's agent negligently failed to obtain them and forward them with the cattle. The agents of the defendant railroad were forbidden the use of memorandum waybills, such as defendant had when plaintiff's cattle reached Memphis. And it was a rule of the Santa Fe Railroad not to receive shipments on memoranda of the kind, of all which defendant had notice.

The contract of shipment in part reads as follows:

"Live Stock Contract. Executed at Bghm., Ala. Station, June 6, 1898.

"This agreement, made between the Kansas City, Memphis & Birmingham Railroad Company, of the first part, and Zack Miller of the second part.

"Witnesseth, that whereas the Kansas City, Memphis & Birmingham Railroad Company, is a common carrier, only at tariff rates and subject to the above rules and regulations, all of which are hereby made a part of this contract, by mutual agreement between the parties hereto. Now, therefore, for the consideration and mutual covenants and conditions herein contained, the said first party will transport for the said second party the live stock described below, which it has received for shipment, and parties in charge thereof as hereinafter provided, viz.:

"........cars, said to contain ....... head of cattle consigned as stated in margin, from Birmingham, Ala., station, to Memphis, Tenn., station, and at that place delivered to ........ or connecting line, at rate named in margin, the same being a special live stock rate made in consideration of the provisions contained in this contract, for and in consideration of which special rate the said second party hereby covenants and agrees as follows:

"This company in behalf of and as agent for connecting line or lines, but not as principal, guarantees through rates as herein set forth.

". . . . And if any said stock shall sustain injury or damage while in transit, the presumption shall be that the same resulted from overloading, or from the neglect or inattention of the party of the second part, or his or their employees accompanying said stock, for which the party of the first part shall in no respect be liable.

"Third.   That at his own risk and expense he is to take care of, feed, water, and attend to said stock, while the same may be in the stock yards of the said first party, or elsewhere, awaiting shipment, and while the same is being loaded, transported, unloaded and reloaded, and to load and unload and reload the same at feeding and transfer points, and wherever the same may be unloaded and reloaded for any purpose whatever, and hereby covenants and agrees to hold said first party harmless on account of any or all losses of or damage to his said stock while being so in his charge, and so cared for and attended to by him or his agent or employees as aforesaid.   And in case the first party should for any reason undertake to water and feed said stock, it shall not be liable for insufficient supplies or imperfect discharge of such undertaking.

"Sixth.   That for the consideration aforesaid, said second party further agrees that as a *condition precedent* to his right to any damages or any loss or injury to his said stock during the transportation thereof or previous to loading thereof for shipment, he will give notice in writing of his claim therefor, stating the grounds thereof, to some general officer of said first party, or to its nearest station agent, or to the agent at the delivering station on the railroad which carries the said stock to destination, or to the nearest station agent or general officer of such delivering road, before said stock is removed from the point of shipment, or from the place of destination, *and before* such stock is mingled with other stock, and within five days after the delivery of such stock at its point of destination, to the end that such

claims may be fully and fairly investigated and will afford a full and fair opportunity for the investigation thereof; and a failure to comply in every respect with the terms thereof shall be held to be a waiver by said second party of any such claim and shall be a complete bar to any recovery therefor. No one except a general officer of said first party has authority to waive such notice, and he only in writing.

"Eighth. The said second party further agrees for the consideration aforesaid, that in case of total loss of his said stock from any cause for which the said first party shall be liable to pay for the same, the actual cash value at the time and place of shipment shall be taken as full compensation therefor."

Defendant offered evidence to the effect that the Louisville & Nashville railroad set the cars containing the cattle on its track at Birmingham, but that its agent did not deliver any billing, expense account, or anything else to defendant at the time; that Miller was anxious for the cattle to go forward as soon as possible, and that in order to accommodate him defendant made up a special or extra freight train for the purpose, and that if it had not made up a special train, as stated, the cattle would not have left Birmingham until 11:45 p. m., and would not have reached Memphis until 2:30 p. m. the next day, which was only a few hours before the time they afterwards in fact did leave Memphis. Defendant claims that on account of the failure of the L. & N. railroad to deliver expense bills to defendant at Birmingham, and on account of the hurry to have the stock reach their destination as soon as possible, it forwarded the cattle to Memphis without the information in the possession of the said Louisville & Nashville Railroad Company. It was shown that the latter company sent to defendant's agent at Birmingham the regular waybills for plaintiff's cattle at about 10 o'clock Sunday, June 5, about three hours after they had started for Memphis, and at the same time notified defendant that

the bills for the Rogers cattle had not been received, which were not delivered until the next day. Upon receipt of the waybills for plaintiff's cattle, defendant's agent at Birmingham telegraphed to its agent at Memphis of such receipt and also other information, which the defendant claims was sufficient to have authorized the agent of the Iron Mountain railroad at Memphis to have received plaintiff's cattle and to have forwarded them at once.

There was evidence going to show that the Iron Mountain railroad's agent at Memphis would have received plaintiff's cattle when they arrived and forwarded them upon the information in the slip waybills mentioned, had defendant's agent tendered them separately from the cars containing the Rogers cattle, but it seems he did not do this as he wanted to get rid of them all at the same time. And it is claimed that it was through Miller's influence that plaintiff's cattle were not so received and forwarded at once because he wanted both shipments kept together for the purpose of getting the Rogers cattle upon his ranch so that he would have the opportunity of grazing them; but there is no evidence that he influenced the Iron Mountain agent in the matter to any extent.

There was evidence to the effect that the water that the cattle had drank when unloaded at Bliss was so impure as to cause their death. There was also evidence that the cattle were worth more in Oklahoma than at Selma, the point of shipment.

The finding and judgment were for the plaintiff in the sum of $856, from all which defendant appealed.

*L. F. Parker* and *Pratt, Dana & Black* for appellant.

(1) Plaintiff was not entitled to recover, and, therefore, defendant's demurrer should have been sustained or defendant's first peremptory instruction should have been given. (2) According to the terms

of the contract for the carriage of the stock by defend-
ant, plaintiff was to be responsible for watering and
feeding the same, and for loading and unloading for
any purpose whatever. (3) It was error for the court
to instruct that defendant would be liable for a general
custom existing between the connecting carrier and
other railroads generally. (4) The second instruc-
tion given above is wrong as well as the first, because it
makes the case depend upon the theory that defendant
did not obtain the regular billing from the Louisville &
Nashville railroad at Birmingham before the cattle left
Birmingham. This is entirely a misconception of the
purpose and nature of a regular waybill as shown by
the evidence. (5) The court committed error in giv-
ing instruction No. 5 for plaintiff. (6) The court
erred in giving instruction No. 4 for plaintiff on the
measure of damages. (7) It was error for the court
to refuse to instruct the jury that there could be no re-
covery for the death of more than twenty-one head of
cattle.

· *J. C. Rosenberger* and *Haff & Michaels* for respon-
dent.

(1) Appellant has failed to furnish a sufficient
abstract of the record and its appeal should be dis-
missed. Reno v. Fitz Jarrell, 163 Mo. 411. (2) Ap-
pellant claims that it is not liable because, when the
cattle arrived at Memphis it had in its possession a tele-
gram, giving all the necessary information in regard to
the cattle. This question was peculiarly for the jury.
(3) Appellant next claims that Miller caused the de-
lay at Memphis by objecting to his cattle going out un-
less the Rogers cattle were taken out also. The evi-
dence, however, is all the other way. (4) Appellant
next seeks to cast the burden of feeding and watering
the cattle at Memphis on plaintiff's agent, Miller, and
relies upon one of the numerous fine-print conditions of
the contract. To this contention we made several an-

swers.    Dunn v. Railroad, 68 Mo. 268; 5 Am. and Eng. Ency. Law (2 Ed.), 463, note; Lowenstein v. Railroad, 63 Mo. App. 68; Duvenick v. Railroad, 57 Mo. App. 550; Kellerman v. Railroad, 136 Mo. 177; Paddock v. Railroad, 60 Mo. App. 328.    (5)    But even taking appellant's view, the instruction at most required plaintiff to prove more than was necessary and was an unnecessary burden on plaintiff.    "An instruction which is too favorable to the losing party can not be made the basis of a reversal."    Summers v. Ins. Co., 90 Mo. App. 691. (6)    Our instruction No. 1 is an accurate statement of the law.    Reynolds v. Railroad, 121 Mass. 291; Mt. Vernon Co. v. Railroad, 92 Ala. 296; Judson v. Railroad, 4 Allen (Mass.) 520; Insurance Co. v. Railroad, 8 Baxter (Tenn.) 268.    (7)    Complaint is made of our instruction No. 5.    This instruction is an accurate statement of the law.    Ferry Co. v. Railroad, 128 Mo. 224.    (8) Plaintiff's No. 4, on the measure of damages, is a correct statement of the law, as settled by repeated decisions in this State.    Sturgeon v. Railroad, 65 Mo. 569; Glascock v. Railroad, 69 Mo. 589; Armstrong v. Railroad, 17 Mo. App. 403; Davis v. Railroad, 13 Mo. App. 449; Railroad v. Traube, 59 Mo. 355.

BROADDUS, J.—The contention of the defendant is that under the evidence the court committed error in not instructing the jury to return a verdict for the defendant; and that the court committed error in the giving and refusing of certain instructions named.

We believe that the court committed no error in refusing to instruct for the defendant on the evidence, as there was ample proof to show that it was through the neglect of defendant's agents that the plaintiff's cattle were not promptly received and shipped by the Iron Mountain road on their arrival at Memphis, which act of negligence resulted in some damage to plaintiff's cattle.    And it is not a matter of dispute that it was negligence on defendant's part not to have had proper

billing accompanying the shipment of the cattle from Birmingham. Reynolds v. Railroad, 121 Mass. 291; Alabama Co. v. Railroad, 92 Ala. 296; Ins. Co. v. Railroad, 8 Tenn. 268. Besides, the jury might have found upon the evidence that the Iron Mountain road would have received and promptly shipped plaintiff's cattle on their arrival at Birmingham on the information contained in the "slip waybills" had they been tendered as a separate shipment from that of the Rogers cattle.

Instructions numbered one and two are not subject to the objection made by defendant that the jury were authorized to find against defendant on a general custom between the connecting carriers and railroads generally, whether defendant had notice of such custom or not. On the contrary, such instructions require that such notice to defendant should have been shown.

Said instructions are also attacked on the ground that it makes the case depend upon the theory that defendant did not obtain the regular billing of the cattle from the Louisville & Nashville railroad, as the information obtained was all that was necessary. It may be true that the information could have enabled the Iron Mountain railroad to have received the cattle and billed them properly to the next connecting carrier, but if its agents refused to receive and ship them because the regular waybill was not tendered, which they were authorized to do under the rule, the fault was with the defendant and there was no delivery to the connecting carrier. Ins. Co. v. Railroad, 8 Baxter (Tenn.) 268; Reynolds v. Railroad, 121 Mass. 291; Alabama Co. v. Railroad, supra.

Instruction number five should not have been given because it was not authorized by the evidence. It is not shown that the plaintiff was required to consent to a delivery of his cattle by defendant, to its own road or that of any other connecting carrier. This instruction in effect tells the jury that, as the plaintiff had the right to designate the railroad at Memphis to which

it wished delivery to be made he was not compelled to consent to a delivery of said cattle by defendant to its own or any other connecting carrier.

Instruction number four is criticised because it fixes the measure of the damages to the cattle as the difference between their condition as they should have arrived at Bliss and their condition as they did in fact so arrive. This objection is based upon the fact that the cattle were destined for White Eagle and not Bliss, but as it was shown that the two points were only a few miles apart the condition of the cattle would not have been materially different had they been unloaded at the former instead of at the latter point, the defendant could not have been prejudiced by the giving of said instruction.

But the further objection is made to said instruction that it fixes the value of the cattle at their destination, whereas the contract fixes their value at the place of shipment. It is contended by plaintiff that this provision of the contract is invalid because there was no consideration for it, as the rate charged was not a reduced rate. There is nothing in this case to show that the rate for transportation was a reduced rate. In Kellerman v. Railroad, 136 Mo. 178, it was held: "A stipulation in a written contract of shipment placing a limited valuation on the property shipped in case of its loss by the default of the carrier when not made in consideration of special or reduced rates of shipment is not binding on the shipper." See also Bowring v. Railroad, 77 Mo. App. 250. "In the absence of any agreement, the place for fixing the value would be at the place of delivery." Sturgeon v. Railroad, 65 Mo. 569; Glascock v. Railroad, 69 Mo. 589; Railroad v. Traube, 59 Mo. 355. But the contract here is not one fixing the value of the cattle, but merely a stipulation providing at what point this value shall be fixed.

In Commission Co. v. Railway Co., 80 Mo. App. 164, it was held: "A stipulation in a bill of lading that

the amount of loss or damage shall be computed at the
time and place of shipment does not apply to loss occur-
ing for failure to deliver the goods in a reasonable time,
but rather to injury during shipment.'' The validity
of the contract itself was not questioned, but the con-
troversy arose over its construction. In this case the
evidence showed that the cattle were worth more in
Oklahoma than at Selma, the place where they were
shipped. But such might not be the case in every in-
stance, for we know that at times property is worth
more at the time and place of shipment than it is at
its destination at the time of its arrival. However the
validity of the contract is upheld in Ragan v. Railroad,
51 Mo. App. 655. It was therefore error for the court
to instruct the jury to compute plaintiff's damages for
cattle lost as of their value at their destination and the
time of their arrival.

The court refused to instruct the jury that there
could be no recovery for more than twenty-one cattle.
This is assigned as error. The contract of shipment,
as seen in the statement, provides as a condition pre-
cedent to plaintiff's right to damages or any loss or
injury to his stock during transportation, that it should
give notice in writing to defendant before the stock was
removed from the point of shipment, of its damages,
to the end that its claim might be fully and fairly in-
vestigated; and that a failure to comply in every re-
spect with the terms thereof should be held a waiver of
such claim. The evidence disclosed that the plaintiff
gave to the defendant notice of the loss of only a part
of its cattle. But it was also shown that defendant
refused to investigate and denied all liability. Such
being the case there existed no necessity whatever for
any notice, and because plaintiff's notice was incomplete
and did not refer to his entire loss can make no differ-
ence, as the defendant by its refusal to investigate his
claim for damages waived all right to the notice pro-

vided by the contract. This is a familiar rule of law as applied to insurance contracts, and we think is especially applicable to the facts of this case.

It is also contended by defendant that as it was the duty of plaintiff under the contract of shipment to feed and water its own stock, the defendant is not liable because said cattle were not properly fed and watered. The plaintiff concedes that such is the law, but that it is also the law that it is the duty of the carrier to furnish a proper place and facilities, and a reasonable opportunity for so doing, which is true. Lowenstein v. Railroad, 63 Mo. App. 68; Duvenick v. Railroad, 57 Mo. App. 550. And as the evidence in this case was that the defendant undertook to perform the duty of watering and feeding the stock at Memphis without the consent of plaintiff, it must be held to account for such damages as resulted from a negligent performance of such duty.

As the defendant asked thirty-three instructions in all, many of which were refused, we will not undertake to review them in detail, as we think what has been said will indicate those which should as well as those which should not have been given.

The plaintiff insists that defendant's appeal should be dismissed for want of a sufficient abstract as required by the rule, and cites in support of its insistence Reno v. Fitz Jarrell, 163 Mo. 411, and other cases of like character; but that and the other cases named no longer govern. See State ex rel. v. Jackson L. Smith et al., Missouri Supreme Court, not yet reported. Under the latter the abstract is sufficient.

For the reasons given the cause is reversed and remanded. All concur.