## GRATIOT STREET WAREHOUSE COMPANY, Respondent, v. MISSOURI, KANSAS & TEXAS RAILWAY COMPANY, Appellant.

St. Louis Court of Appeals, April 30, 1907.

1. COMMON CARRIERS: Act of God. There is no liability on the
part of a common carrier for loss of freight which occurs solely
by the act of God, that is, from causes, such as the operation
of the elements, over which the carrier has no control, and
which could not reasonably be foreseen or anticipated.

2. ———: ———: Duty to Anticipate Flood. A railroad company
built its yards on the banks of the Mississippi river in 1892
during which year an extraordinary flood occurred so that the
high water mark was thirty-six feet; this stage was not after-
wards reached up to 1903, and no damage resulted from the
thirty-six foot rise. Although a stage of forty-one feet was
reached in 1844 and thirty-seven feet in 1857, the company was
not negligent in failing to protect the yards against inundation
above the thirty-six foot stage. Improvements in the river bed
and adjacent streams which were matters of common knowl-
edge were such that an ordinarily prudent person would not an-
ticipate a stage of water in excess of thirty-six feet.

124 App.—35

3. ——: ——: Negligence. A railroad company received a carload of corn for shipment and, in the usual course, with ordinary diligence, the car would have been taken out of the yards several hours before the occurrence of an unprecedented flood which destroyed it. In an action for the loss of the car, it was a question for the jury whether the railroad company negligently delayed getting the car en route.

4. ——: ——: ——. Where a railroad company, in order to preserve its main line intact from the ravages of an extraordinary flood, cut an embankment so as to turn the water on to its yards whereby they were flooded sooner than they would otherwise have been, the railroad company was negligent and liable for loss of a carload of freight caused by such premature flooding of the yards.

5. ——: ——: ——: Proximate Cause. In order that a common carrier may escape liability for loss of freight, lost through the act of God, the act of God must be the sole cause of the loss; if the carrier's negligent act commingled with the act of God as an active element, the carrier is liable for such loss.

6. ——: Damage for Loss of Freight: Prepayment of Freight Charges. While a common carrier has a right to demand the payment of freight charges in advance, it waives that right by accepting goods for shipment and transportation without exacting such payment, and is liable for loss of freight in such case, though the charges are not paid.

7. ——: ——: Parties: Consignee. When the loss of freight in transit occurs, the consignee or the assignee of the bill of lading, being the real party in interest, is a proper party plaintiff to recover such loss.

8. ——: ——: ——: Consignor. When loss of freight occurs through the negligence of the carrier, the consignor may recover for the loss though he has no property interest in the freight, on the ground that it is an action for a breach of a contract to which he is a party, as the trustee of an express trust, under the provisions of section 540, Revised Statutes 1899.

9. ——: ——: Measure of Damages. Generally the measure of damages for loss of freight by negligence of a carrier is the market value of the goods at point of destination, with interest from the time the goods should have been delivered, less the amount of freight charges due.

10. ——: ——: ——. But it is competent for a carrier to stipulate in its bill of lading that in case of loss the damages shall be the value of the goods at the time and place of shipment.

11. ———: ———: ———: **Consistent Theories.** In an action for the loss of freight caused by the negligence of the carrier, the defendant, where the bill of lading provided that the damages should be measured by the value of the goods at the time and place of shipment, evidence was introduced without objection to show the value of goods at the point of destination and the case was tried on that theory. The defendant could not on appeal be heard to complain that there was error in admitting such evidence.

Appeal from St. Louis City Circuit Court.—*Hon. Jesse A. McDonald*, Judge.

·AFFIRMED.

*George P. B. Jackson* for appellant.

(1) The defendant could not be compelled to assume the responsibilities of a common carrier, without prepayment of freight charges, or an agreement waiving the same, and the court therefore erred in refusing defendant's second instruction. Railroad v. Steamship Co., 86 Fed. 407. (2) The bill of lading provided that the amount of any loss or damage should be computed at the value or cost at the place of shipment. The only proof of value was as to what the corn was worth at Wichita Falls, Texas, the destination. There was, therefore, no proper evidence on which to submit the case— and the court erred in sending it to the jury. Caples v. Railroad, 17 Mo. App. 14; Rogan v. Railroad, 51 Mo. App. 672. (3) The plaintiff proved that the title to the corn sued for had passed to E. G. Rall, of Wichita Falls, and there was no evidence that it had ever been revested in plaintiff, and for that reason there could be no recovery in this case. Ober v. Railroad, 13 Mo. App. 86; Com. Co. v. Railroad, 87 Mo. App. 336; Dymock v. Railroad, 54 Mo. App. 400; Bank v. Railroad, 62 Mo. App. 538; Skilling v. Bollman, 73 Mo. 665. (4) The loss of the corn in question resulted from the flood— an act of God—on account of which the defendant was

not liable. Grier v. Railroad, 108 Mo. App. 565; Brewing Assn. v. Talbot, 141 Mo. 674; Moffatt v. Railroad, 113 Mo. App. 544.

*Frank K. Ryan* for respondent.

(1) The appellant's responsibility is not affected by the fact that the freight on the car of corn was not paid in advance, and, therefore, appellant's second instruction was properly refused. Ray on Imposed Duties of Freight Carriers, sec. 126, p. 847; Railway v. Keith, 8 Ind. App. 57; 3 Wood's Railway Law, sec. 428; Railway v. Morton, 61 Ind. 539; Railway v. Hollowell, 65 Ind. 188; Bastard v. Bastard, 2 Shaw 82; Barnes v. Marshall, 18 Ib. 785; Pickford v. Railway, 8 M. & W. 372. (2) The respondent's evidence showed the value or cost of the corn at the place of shipment and the finding of the jury was in accordance with such testimony. Mitchell v. Weir, 45 N. Y. Supp. 1085; The Arctic Bird, 119 Fed. 167, 175; 3 Suth., Damages, 247. (3) The respondent, as the consignor in the bill of lading, was the proper party to bring this suit. Atchison v. Railroad, 80 Mo. 213; Harvey v. Railroad, 74 Mo. 538; Blanchard v. Page, 8 Gray 281; Finn v. Railroad, 112 Mass. 524; Southern Express Co. v. Kraft, 40 Miss. —; Railroad v. Schwartz, — Ill. App. 490. (4) The loss of the respondent's corn did not result from an act of God, but was occasioned by the acts of appellant and failure to use due diligence in caring for the car of corn. Woll v. Express Co., 43 Mo. 425; Davis v. Railroad, 89 Mo. 340; Lamont & Co. v. Railroad, 9 Heisk. 58; Greer v. Railroad, 108 Mo. 568; Prince & Co. v. Compress Co., 112 Mo. App. 49. (5) When the appellant received respondent's corn, a rise in the river was threatened such as to make the loss of the corn in transportation a probability, and it was for the appellant to determine whether or not the corn could be safely transported to Wichita Falls. Hutchinson on Carriers, sec. 186;

Charleston, etc., S. B. Co. v. Boston, 1 Harper 262; Express Co. v. Jackson, 8 Pickle 326; Loomis v. Pearson, — Harp. 468; New Brunswick Co. v. Tiers, 64 Am. Dec. 394, 411.

STATEMENT.—The suit is for the value of a carload of corn, which, while under contract of affreightment, was damaged and practically destroyed by means of the high water resulting from the overflow of the Mississippi river, June, 1903. The material facts are: plaintiff a dealer in and shipper of grain, having an order for a car of corn from a customer in Texas, delivered the laden car to the Wiggins Ferry Company for the purpose of delivering the same to the defendant railroad company on June 3, 1903, received from the ferry company a receipt therefor, and on the same date, June 3, at about one o'clock, p. m., the plaintiff delivered this receipt to the defendant's proper agent at and in charge of its commercial office, Broadway and Chestnut streets, St. Louis, and contracted with the defendant, through said agent, for the shipment of the car, shipper's order, consigning same to itself (the plaintiff) at Wichita Falls, Texas, with directions to notify E. G. Rall, he being the plaintiff's customer for such corn, at which time defendant's commercial agent, upon the surrender by plaintiff to him of the Wiggins Ferry Company's receipt evidencing the car then in the ferry company's custody, issued in duplicate two bills of lading therefor, the original of which was delivered to plaintiff and the copy retained by defendant's said agent. The bill of lading then issued and delivered to plaintiff and under which the car was shipped, is dated June 3, 1903, and covers fifty-six thousand pounds bulk corn then contained in this car marked M., K. & T. R. R., No. 11747, and provides for its carriage over defendant's and connecting lines to Wichita Falls, Texas, at the rate of 22½ cents per hundredweight. As said before, the

shipment was made by the plaintiff to itself, it being both consignor and consignee, marked "Shipper's order, notify E. G. Rall." The bill of lading introduced in evidence bears the stamp of the defendant's transit inspection bureau, June 3, 1903, and among other things, contains the following provisions. "It is understood as a part of the conditions under which said packages are received, that neither this railway company, nor any other carrier shall be liable . . . for any loss or damage occasioned by riots, strikes, the acts of God, or the public enemy." And provides that in event of loss or damage to the property (the corn) therein mentioned, "the amount of loss or damage shall be computed at the value or cost" of such corn "at the place and time of shipment."

The car of corn never reached the destination mentioned. On June 5, it was still in the defendant's yards, immediately adjacent to the Mississippi river in North St. Louis, and was so damaged by the high waters of that date as to be practically destroyed. The principal defense interposed and relied upon to defeat plaintiff's recovery, is that the damage resulted from the act of God, by the sudden and unexpected inundation of defendant's yards, by reason of the extreme high water of June 5. It will be observed by reference to the clause of the bill of lading above quoted, that the defendant is not liable for loss or damage resulting from the act of God.

The plaintiff having made a prima-facie case by the introduction of the bill of lading and oral testimony in support of the allegations of its petition, the defendant sought to bring itself within the exception in the bill of lading referred to, and in order to escape liability under this provision of its contract, showed first, that although the bill of lading was issued by it to plaintiff on June 3 at about one o'clock p. m., the car, in fact, was not placed in its yards by the Wiggins Ferry Company until

1:25 p. m. on the following day, June 4, and that when the car was thus actually placed in its charge there was no "card" accompanying the same, showing its destination, nor did any shipping instructions accompany the car from the ferry company and in the absence of this card or shipping instructions, the car was 'placed on the holdover track by defendant's yard men, awaiting the necessary billing and instructions, in the usual course, from its commercial office, and that such billing and instructions were not received by those in charge of the yard office until morning of June 5, on which date, at about eleven o'clock a. m., the yards became so completely inundated as to enforce a suspension of the work of removing the cars therefrom, and that for the reason no card or instructions accompanied the car on June 4, when received from the ferry company, and none were communicated from its commercial office to the yard office until the morning of June 5, it was impossible by the exercise of ordinary endeavor and diligence in that behalf, to remove the car from its perilous situation before the inundation became of such proportions as to render it wholly impossible.

By Mr. Bowie, the officer in charge of the United States Weather Bureau at St. Louis, the defendant showed the high water which occasioned the loss to have been of an extraordinary character, so much as to, on June 10, exceed any stage of the river since the year 1844. Witness gave testimony with respect to the comparative statement of the several high-water stages for many years at St. Louis from the records at his office, from which testimony the following table is taken:

| "Flood of 1844, | high water mark, | 41.4 ft. |
| Flood of 1857, | high water mark, | 37.1 ft. |
| Flood of 1892, | high water mark, | 36. ft. |
| Flood of 1903, | high water mark, | 38. ft." |

His record also showed for the several days, including the date of the shipment involved, just prior thereto

and imediately thereafter, the stage of the water, as ascertained about 6:30 each morning and 6:30 each evening as follows:

"May 31 .................... 25.6 ft.
June 1 .................... 27.8 ft.
June 2 .................... 29.9 ft.
June 3 .................... 31.2 ft.
June 4 .................... 32.8 ft."

On the morning of June 5, the high-water mark was 33.5 feet and the evening of the same day, 34.2 feet. It reached its highest stage of thirty-eight feet on June 10, after which it gradually receded. It was also shown by this witness that his office issued daily bulletins from May 29, each day, prior to and including the days involved in this controversy, predicting a continual rise in the river at this point, as above indicated, and that these bulletins were daily published in the morning and afternoon papers of the city of St. Louis for the information of the public. On June 2, the weather bureau predicted and published the Mississippi river to be above the danger line at all points in the St. Louis district and that it would rise rapidly. On June 3, the prediction was the rise would continue rapidly during the next forty-eight hours, with a stage of 32½ feet by Thursday morning and thirty-four feet by Friday. Measures to protect property subject to damage from a thirty-five foot stage Saturday or Sunday were advised. On June 4, witness' bulletin was to the following effect: "The rise will continue rapidly and 32½ feet will be reached Friday morning, 34½ feet Saturday morning and a stage of thirty-five feet is forecasted for Saturday night or Sunday. Measures to protect property from a thirty-six foot rise on Monday should be taken."

Defendant proved that its main line of railroad runs along an embankment immediately on the west bank of the Mississippi river in north St. Louis, and its

yards for the handling of its freight cars and loads is immediately west of its main line at this point; that its said yards are about three feet lower than its main line and that it has a line of railroad or trackage also constructed on an embankment immediately on the west side of its yards. The two levees or embankments, the one on the east side, on which its main line is situate, and the one on the west mentioned, operate as a levee or protection against the rising river and the overflow therefrom and therefore render its yards, although on lower ground, secure from all ordinary rises of the river, and had since their construction in 1892, operated a safe and reliable protection from the thirty-six foot stage of water of that year, which was the highest stage known since 1857, and it afforded complete protection at all times thereafter, up to June 5, 1903, the date on which plaintiff's corn was lost. Upon this showing, it maintains that it had exercised reasonable diligence with respect to this and other cars then in its yards and that the exceeding high stage of water inundating its yards on June 5, so far exceeded all recent human experience as to extend quite beyond the rule requiring the defendant to exercise due diligence to the end of preserving the car from loss, within the range of reasonable anticipation, and that the exceeding high stage of water at that date and the consequent overflow of its yards from which the plaintiff's loss occurred, was therefore solely an act of God, without the defendant's negligence in any manner, contributing thereto, inasmuch as an ordinarily prudent person would not anticipate this extraordinary stage of water. In furtherance of the theory that it was in nowise negligent, contributing to the loss, it introduced much evidence tending to show the usual course of procedure for handling freight and placing in an outgoing train, cars situate as this one was (not accompanied upon its delivery with a card or other shipping instructions). The result of this evidence is that

in case a car is not accompanied with a card or other shipping instructions, then it is held on the hold-over track, until, through the usual course, a shipping bill, as issued by the commercial office, is conveyed by messenger from that office and passes through an intermediate office, where certain records are made, and finally reached the yard men, in the usual course of from four to six hours after the bill of lading is issued, if issued early in the day. The defendant's clerk gave evidence to the effect that a bill of lading, issued as this one was, about one o'clock p. m. would in the usual course, reach his intermediate office about four o'clock in the afternoon, where certain records were made of the transaction, and it would then pass to the hands of the yard men the following morning. This evidence seems to have been introduced upon the theory that the bill of lading was issued about one o'clock June 4, instead of June 3, and that in the usual course, by the exercise of the most urgent endeavor, it taking its place with other shipments, would not have reached those in immediate charge of the car in the yard, until the morning of the fifth, too late to have enabled them to remove the car, taking its turn with several hundred others in the yard, prior to the complete inundation which occurred about eleven o'clock a. m. of that same day, which operated to dampen the fires in the locomotives so as to suspend operations. Parenthetically, we will say here that this theory is not sustained by the proof, for all the evidence goes to show, and it stands as an established fact in the case that the bill of lading was issued about one o'clock p. m., on June 3, as appears by its date, also by the stamp of the inspection bureau thereon, and is also verified by the testimony of Mr. Weidmer, president of plaintiff warehouse company, the only witness testifying to the transaction, who affirms that he had verified the date, as appears by the question of the learned counsel for defendant and the witness' unqualified and point-

ed answer thereto, as follows: "Q. Isn't it very possible you would take it (the bill of lading) around there and leave it on the third and get it on the fourth? A. No, sir; I looked it up. I drew our draft on the third. Q. "You might draw your draft on the third —. A. No, I looked it up." Speaking of the bill of lading, therefore, in view of this established and uncontroverted fact that the bill of lading was issued on the third, in its usual course, according to defendant's evidence, it would be in the hands of the yard men on the morning of the fourth of June, a few hours prior to the actual delivery of the car to it in the yards by the ferry company at 1:25 p. m. that day, and defendant's general yardmaster testified that eight or ten hours was a reasonable and the usual time required in the ordinary course, for transporting a car from the yards in an outgoing train after the billings were received by the yard men.

To the end that the defendant's negligence contributed to the loss of the car of corn, plaintiff proved in rebuttal by one Smythe that he was assistant general yardmaster on the date in question in defendant's yards; that the defendant had been employing five locomotives and crews all of the time in the yard and one additional locomotive a portion of each day and night, immediately prior thereto, but by reason of the impeded business resulting from the floods and washouts, had reduced the force on the day in question to three locomotives and crews in the yard proper, placing another locomotive at a different point, denominated Prospect Hill, and another at Mound street; that it then had available for work in its yards, ten locomotives, only three of which were employed on the day in question; that at seven o'clock in the morning of June 5, the water from the river was seeping over the embankment and under the rails of the main line for about two miles, and running down what was termed "a lead" into the yards, so that it was at places ankle deep; that witness suggested to

Mr. Ustick, general superintendent, and Mr. Swanson, general yardmaster, both of whom were then present and directing operations, the possible overflow of the yards, from the source mentioned, and that additional locomotives and crews should be furnished to aid in the removal of the several hundred cars, then imperiled. The witness said: "I told Mr. Swanson and Mr. Ustick on the morning of the fifth; I told them we had better put on more power and try to get those cars out of the yard. . . . They said they thought they would be able to save it." No additional locomotives and crews were furnished. He further testified that in the morning, the general superintendent said he did not want the wheels of the new cars to get rusty and therefore devoted a portion of the time to removing about one hundred and fifty empty cars to Branch street, which time would otherwise have been devoted to removing the loaded cars; that the water which finally inundated the yards about eleven o'clock and prevented the removal of the remaining loaded cars, of which the plaintiff's car was one, came from the west side of the yard and was admitted by the act of defendant's section men, under the direction of the general superintendent, cutting the embankment supporting the track on the west side of the yard so as to remove the pressure of water upon, and the probable consequent dislodgment of the main line, and that the cars could have been removed had this embankment not been cut. On this matter the defendant's learned counsel asked, and the witness gave the following testimony: "Q. Do you mean to have this jury understand that if they had not cut this track there would not have been any water in there? A. No, sir; I do not say that, but I say that we would have had a chance to have removed these cars before they were swamped in this hole." In surrebuttal the defendant's general superintendent denied his order to remove the new empty cars, but admitted the removal of many

of them saying they were so located in the distribution over the yard as to render their removal necessary in order to reach the loaded cars. He said as all of the cars had been removed from the west yard, which was somewhat lower than the east yard, the yards being adjacent, however, under the direction of the company's civil engineer, he caused the embankment on the west of the yard to be cut about 10:30, June 5, for the purpose of removing the pressure of water from the main line, and that the work of removing the cars was suspended about eleven o'clock because the water had reached such a stage in both yards as to destroy the locomotive fires and render it impossible to further proceed.

Upon this state of facts, the case was well instructed to the effect that if the plaintiff's loss occurred solely from an act of God, without defendant's negligence contributing thereto, then the finding should be for the defendant; and on the other hand, that if the defendant's negligence contributed or was the proximate cause of the loss, then the finding should be for the plaintiff. The jury found the issues for the plaintiff. Defendant appeals. Other facts relevant only to the questions presented will be noticed in the opinion in connection therewith.

NORTONI, J. (after stating the facts).—1. An instruction, peremptorily directing a verdict, was requested by defendant's counsel and refused. This action of the court is assigned and argued as error, on the theory that the loss in this case was entailed solely by the act of God, unmixed with any neglect of duty on the part of the defendant. Several cases were cited sustaining the well-established doctrine that there is no liability when the loss occurs solely by the act of God, or from causes, such as the operation of the elements, over which the defendant had no control, and could not reasonably be foreseen or anticipated, as probabilities por-

tending calamity, so as to afford the defendant a rea-
sonable opportunity for protecting the property in its
charge, and thus acquit itself of responsibility.  These
cases are Grier v. St. Louis, etc., Ry. Co., 108 Mo. App.
565, 84 S. W. 158; Amer. Brew. Co. v. Talbott, 141 Mo.
647, 42 S. W. 679; Moffat Com. Co. v. Union Pacific Ry.
Co., 113 Mo. App. 544, 88 S. W. 117.  In 1892, the year
the defendant's yards were built, the water reached a
stage of thirty-six feet, and no damage to freight in the
yards resulted therefrom. The conditions remaining the
same, this fact, of course would lead an ordinarily pru-
dent person to believe them reasonably secure from in-
undation by any stage of water less than that attained
that year, and although a stage of 41.4 feet was reached
in 1844, and 37.1 feet in 1857, of which defendant had
notice, it is hardly just to say that an ordinarily pru-
dent person would anticipate a like stage of water in
1903, in view of the fact, first, that thirty-six feet was
the highest stage since 1857, and second, in view of
the further fact that since that date much change and
improvement has been wrought with respect to the topog-
raphy of the country, and for the carriage of waters in
the Mississippi and Missouri valleys; for instance such
as straightening small streams, draining swamps and
lakes, removing the lodgment of driftwood and other
causes which naturally impeded the free flow of the wa-
ter in the early days.  We all know this has been done,'
looking to the further development of the country for
agricultural purposes and for the betterment of the pub-
lic health.  So, were this the whole case and the de-
fendant were otherwise diligent, no doubt it should have
been peremptorily acquitted of negligence here, under
the influence of the principle requiring one to exercise
the proper measure of care, whatever that may be, in
the discharge of a duty, to measure and ascertain the
degree of care required by the law by what appears in
the usual course of human events, and endeavor to be

within the realm of reasonable anticipation, as under this principle, no one could fairly and justly say this defendant was negligent in not providing protection against less than a thirty-six foot stage of water; that is 33.2 feet, the high-water mark of June 5, when experience had dictated its labors to that end had been abundantly sufficient against thirty-six feet of water theretofore, and that thirty-six feet was the highest stage obtained by the river in recent years, since 1857, a period of forty-six years. This however, is not the whole case as made by the proof, and its discussion is beside the true question at issue. There is substantial proof of two separate elements of negligence with which the court must reckon. First, it appears as an established fact and uncontroverted in the proof, that the defendant issued its bill of lading for the car of corn in question about one o'clock on June 3, and from its own witness, it is established by the usual course, the billing of the car would have been communicated to its intermediate office by four o'clock that afternoon; that it would be retained there from one to two hours, until proper records were made, and passed on and reach the yard office on the morning of June 4, and therefore, had defendant's agents been ordinarily diligent and passed the bill of lading on, as was the usual course, it would actually have been in the hands of the yard men at the time, and several hours prior to the actual physical receipt of the car at 1:25 on the same day. There is no doubt from the record, in fact it is an uncontroverted fact, that the car was not delivered until 1:25, June 4, and while this is true and defendant could not be liable for neglect thereabout, until the car was actually received, some one must have been inattentive about the process of forwarding the billing from the commercial office, for it appears the billing was not received in the yard office until the morning of June 5, whereas, ordinary diligence would have placed it there on the

morning of June 4, in advance of the car, and in the usual course of handling cars in and transporting them from the yard in an outgoing train, as testified to by the general yardmaster, the car would have gone forward on a train in the course of eight or ten hours after shipping instructions were received from the commercial office, or at least prior to the morning of June 5, or in other words, prior to the delivery of the billing by its intermediate office, to the yard office. So it appears from this that the defendant's agents were inattentive and negligent with respect to their duty in passing the billing on to the yard office, which negligence operated to hold the car in the yards until June 5, when, in the usual course, it should have been en route to its destination before midnight on June 4. Without comment on the proof pertaining to the alleged order of the superintendent to remove the new empty cars in order to preserve their wheels from rust, and permitting the numerous loaded cars to remain in the yards, and without comment upon the evidence with respect to the employment of only three locomotives in the yard, when ten were available to remove the loaded cars, all of which was contradicted, and either of which we are of opinion is sufficient to send the question of defendant's negligence to the jury, there appears by the uncontradicted proof that defendant's superintendent, under orders from its civil engineer, caused to be cut the west embankment, seeking to preserve the main line intact, and thus inundated the yards at 10:30 by its voluntary act, to such an extent that the labors which would otherwise have probably resulted in removing plaintiff's car to a place of safety, were compelled to be suspended at 11:00 o'clock on that day and the car of corn was thereby destroyed. Now, it is well-settled law that if the defendant's negligence commingled with and operated as a contributive element proximate to the injury, even though such injury is to some and even a paramount injury,

operated by the act of God, the defendant will be liable as though its negligence were the entire and sole cause of the loss. In order for the defendant to escape liability under the exemption afforded by the law to the entailments of an act of God, the act of God must be the sole and only cause of the injury and this too, unmixed with the negligence of the defendant, for if the defendant's negligent act commingled with it in the loss as an active and co-operative element and the loss is proximate thereto, or, in other words, is a reasonable consequence of the negligent act, it is regarded in the law as an act of the carrier rather than as an act of God. The principle is manifest from all of the cases and evidence of its proper application abounds in the books. [Wolf v. Amer. Ex. Co., 43 Mo. 421-425; Davis v. Railroad, 89 Mo. 340; Grier v. Railway, 108 Mo. App. 565; Prince v. St. Louis Cotton Compress Co., 112 Mo. App. 49, 86 S. W. 873; LaMont v. Railway, 9 Heisk. (Tenn.) 58; Moffat Com. Co. v. Railroad, 113 Mo. App. 544.] It seems clear, first, that the negligence of defendant's agents in not advancing the shipping bill and instructions, operated to detain the car in a place which proved to be of peril for many hours after it should have been en route to its destination, if they had been ordinarily diligent, and, second, that the voluntary act of defendant inundated and destroyed the corn when it might have been removed to a point of safety had the embankment not been cut. The learned trial judge very properly referred the issue of defendant's negligence to the jury.

2. It appears that the freight was not prepaid by the plaintiff and nothing was said between the parties with respect to the matter. No special contract was made with reference to credit, the entire transaction being the plaintiff offered the car of corn for shipment, defendant accepted it, and issued to plaintiff its bill of lading, making no requirement as to freight in advance.

The plaintiff had frequently shipped cars over the defendant's road, the freight being paid, impliedly, at the point of destination, which was afterwards done, without any special agreement as to the matter. On this state of facts, the learned counsel insists that no liability attaches against the defendant, for the reason the freight had not been paid in advance. It is abundantly established in the law that while a common carrier must carry for one and all alike and thus serve the entire public impartially, it has the right to demand and refuse to carry until its charges are paid in advance, and it has the same right as any other free agent to extend credit to whom it pleases, but the right of a common carrier as to prepayment of its charges is deemed to have been waived by it if it accepts the goods of the shipper for transportation without exacting such payment in advance, and liability will attach in such case as though the freight were actually prepaid. This proceeds upon the theory of a usual custom in the world of commerce to that effect and that it is often convenient to the parties to receive the freight and collect the charges upon delivery to the consignee. It is amply fortified and the carrier rendered secure by the fact that it has a lien for its charges in that behalf always, and the general rule is that unless there is some agreement to that effect, the freight is not payable until the goods are delivered. [Railway v. Keith, 3 Ind. App. 57; Ray on Neg. of Imposed Duties of Carriers, sec. 126; 3 Wood on Railroads, sec. 428; 4 Elliott on Railroads, secs. 1558-1569; Railway v. Hollowell, 65 Ind. 188; Barnes v. Marshall, 18 Adolph & Ellis 785; Bastard v. Bastard, 2 Showers 82; Pickford v. Railway, 8 Meeson & Welsby 372.]

3. As stated, the car was shipped by plaintiff, consigned to the plaintiff at Wichita Falls, Texas, shipper's order, with directions to notify E. G. Rall, and it appears from the evidence of the plaintiff's president that

on the day the bill of lading was issued, June 3, he made a draft on Mr. Rall for $519, the selling price of the corn, less freight, and with the bill of lading attached, negotiated it through the bank, that in due time the draft was presented to Mr. Rall and he paid the same. The corn not having arrived a few days thereafter, Mr. Rall notified the plaintiff's president to that effect, who, upon ascertaining it had been destroyed, informed the defendant that this draft had been paid and requested the defendant to reimburse Mr. Rall therefor, thus making a claim for Mr. Rall. The defendant not having made a reimbursement about July 12, Mr. Rall drew upon the plaintiff for the amount therefor with exchange, which draft plaintiff honored. Upon this state of facts the defendant insists the plaintiff cannot maintain this suit, for the reason the corn (which was not entirely destroyed) was the property of Mr. Rall at the time of the loss. Now, it is very true that in a sense, a bill of lading is negotiable, not precisely as a note; but as a symbol of the property covered thereby; it is assignable, and such assignment constitutes in the law, a complete legal delivery of the goods, thereby evidenced to be in the hands of the carrier, as effectually as an actual sale and delivery thereof. [Skilling v. Bollman, 73 Mo. 665; Ober v. Railway, 13 Mo. App. 81; Livestock Com. Co. v. Railway, 87 Mo. App. 330-336; Dymock v. Railroad, 54 Mo. App. 531-538; 4 Elliott on Railroads, 1415, 1428.] And therefore when the loss of the goods occurs after the assignment and the vesting of the title to the goods in the consignee or the assignee of the bill of lading, such consignee or assignee is no doubt a proper party plaintiff in an action to recover for such loss, in keeping with the rule that the action should be prosecuted by the real party in interest. [Ober v. Railway, 13 Mo. App. 81; 4 Elliott on Railroads, sec. 1692; 3 Hutchinson on Carriers, secs. 1304, 1305, 1306, 1307.] However, this may be, waiving the question

whether or not the repayment by plaintiff to Mr. Rall and its thereupon reacquiring the bill of lading, did not reinvest plaintiff with the right of action for the damages as a question wholly immaterial to a proper disposition of the case. It is now well settled in the law of this and many other States, following the early case of Blanchard v. Page, 8 Gray (Mass.) 281, where in a very elaborate discussion on principle, by Chief Justice SHAW, the doctrine was announced that even though the consignor had no property or interest in the goods, he is a proper plaintiff in an action for a breach of the contract on the ground that he had an interest in the contract. The doctrine proceeds upon the contractual privity existing between the original parties which operates a cause of action, after the carrier's service is performed thereunder, in favor of the carrier and against the consignor for the freight, and for this reason conversely renders the shipper, although not the owner of the goods, a party in interest to the contract. Secondly, it is said it does not lie with the carrier who made the contract, to say, upon a breach, that the consignor is not entitled to recover the damages, unless it be shown that the real party in interest objects, and in the absence of such a showing, it will be presumed the action is prosecuted with the knowledge and consent, and for the benefit of the owner. This doctrine is abundantly fortified in the law, and is the doctrine of the Supreme Court of this State, as appears by the Missouri cases hereunder cited. [See also 3 Hutchinson on Carriers, secs. 1308, 1309; 4 Elliott on Railroads, sec. 1692; Finn v. Railway, 112 Mass. 524; Southern Ex. Co. v. Craft, 49 Miss. 480; Railway v. Schwartz, 13 Ill. App. 490; Cooper v. Railroad, 27 Wis. 81; Harvey v. Railway, 74 Mo. 538; Atchison v. Railway, 80 Mo. 213; Reynolds v. Railway, 85 Mo. 90; Davis v. Railway, 126 Mo. 69-77, 28 S. W. 965; Hance v. Railroad, 62 Mo. App. 60; 3 Ency. Pl. and Pr., 825-828.] Whatever may be said

with respect to the infringement by this doctrine on the rule of our code, announced in section 540, Revised Statutes 1899, requiring suits to be instituted in the name of the real party in interest, it is too late now to discuss it. The question was not considered by Justice SHAW in Blanchard v. Page, supra, as the code provision did not obtain in Massachusetts, and it seems that this identical feature of the question has never been considered by the courts of this State. The cases have proceeded, no doubt upon the theory that the whole matter was foreclosed in the law and sufficiently answered by the Supreme Courts of Wisconsin and Mississippi, by reference to the doctrine operated by the rule, constituting the consignor the trustee of an express trust for the benefit of the real party in interest, the same as a factor or other mercantile agent contracting in his own name for the benefit of his principal, and this places the case within the exception to section 540, supra, in favor of suits by trustees of an express trust, and at the same time removes it within the influence of the succeeding section, 541, authorizing suits in the name of such trustees for the benefit of the real party and a recovery of course, by the trustee, would operate a bar to another recovery for the same cause by the party in interest. [Hooper v. Railway, 27 Wis. 81, 90; Southern Ex. Co. v. Craft, 49 Miss. 480, 491; see also Hutchinson on Carriers, secs. 1308, 1309.] The consignor is a proper party plaintiff, whether it was the owner of the goods at the date of the loss or not, and this point will therefore be ruled against the defendant.

4. The bill of lading stipulates, in event of loss, "the amount of loss or damage shall be computed at the value or cost of the (corn) . . . at the time and place of shipment." It does not appear that this stipulation is supported by a reduced rate of freight or other special consideration. There was no direct evidence introduced as to the value or cost of the corn at St.

Louis at the time of shipment, all of the proof on that question being directed to the market value of the corn at Wichita Falls, Texas, at the time it would have arrived there in the usual course. It amounted to showing the market value of the corn at the point of destination at the time it should have arrived to be 64½ cents per bushel, delivered, that is, with the freight added; that the freight was 22½ cents per hundredweight, and therefore the corn, with freight included, was of the market value of $645, and without the freight, which amounted to $126, was $519. The verdict returned by the jury was for the latter amount, $519. All of the evidence fixing the value of the corn at Wichita Falls, Texas, was introduced without objection, and there was no instruction requested by either party nor given by the court on the measure of damages. On this state of the record, the defendant insists the judgment must be reversed and the cause remanded, for the reason there is no evidence as to the value or cost of the corn in St. Louis, the place of shipment, at the date mentioned. Now the general rule is, in the case of such loss, the measure of damages recoverable by the shipper is the market value of the goods at the point of destination, with interest from the time the goods should have been delivered, less the amount of freight charges due for their transportation. [Railroad v. Traube, 59 Mo. 355; Davis v. Railroad, 13 Mo. App. 449; Sturgeon v. Railway, 65 Mo. 569; Lesinsky v. Great Western Dispatch, 13 Mo. App. 576; 5 Am. and Eng. Ency. Law (2 Ed.), 373.] And it was no doubt in conformity with this general rule the learned counsel proceeded in making his proof. Notwithstanding this doctrine, however, the provisions of such contracts limiting the measure of recovery to the value or cost of the goods at the time and place of shipment, have frequently been sustained by this court as valid, when they have been freely and fairly made, even though the loss occurs from the car-

rier's negligence, and the stipulation is not supported by a reduced rate of freight or other special consideration. It is said that while it is not competent for the carrier to contract for an exemption of liability arising on account of its own negligence, it is competent for it to contract the loss shall be measured by the standard of cost or value at the time and place of shipment. [Caples v. Railway, 17 Mo. App. 14; Rogan v. Railroad, 51 Mo. App. 665; Hance v. Railroad, 56 Mo. App. 483-86; Horner v. Railroad, 70 Mo. App. 285, 294.] And so, too, the Kansas City Court of Appeals has announced the same doctrine in Livestock Com. Co. v. Railway, 100 Mo. App. 674, 689, 75 S. W. 782. See also Railroad v. Langdon, 71 Miss. 321, 326. Whether the doctrine is sound or not in principle, as changing the rule fixed by the law for the admeasurement of damages entailed by the carrier's negligence, it is said to be supported by the greater weight of authority. [1 Hutchinson on Carriers, sec. 430 and cases cited; 5 Am. and Eng. Ency. Law (2 Ed.), 335 and cases cited.] And it is certainly settled in the jurisprudence of this jurisdiction.

In view of the validity of the stipulation mentioned, counsel for defendant argues its peremptory instruction should have been given. This cannot be true, for on any view of the case, plaintiff would be entitled to nominal damages for the breach. [Rogan v. Railroad, 51 Mo. App. 665, 672.] Therefore this instruction was properly refused on this feature of the case and with this instruction out of the way, the question now argued is not even suggested in the record before us. Now there is no doubt that had the evidence been admitted over defendant's exception or had the court given a misdirection to the jury with respect thereto, or refused to give proper direction thereon, under the authorities cited by the defendant, a reversal of the judgment would result; for then the matter would have been brought directly to the attention of the court and the erroneous ruling

made thereon stand open for review here. It is insisted, however, that even though no objection was made to the evidence and no instructions were requested or given on the measure of recovery, the general denial in the answer imposed the burden upon the plaintiff to establish the value or cost at St. Louis and this it failed to do. We are persuaded that in the state of the record before us, the question thus presented is not reviewable in this court. It is obvious from the entire record that both parties in the circuit court proceeded on the theory that the proper measure of damages was the market value at the point of destination; in fact, no controversy was had with respect to the measure of recovery at all. The evidence went in, and the case was tried upon the theory indicated. The contest was principally upon the question of defendant's liability, discussed in the first paragraph of the opinion. The other questions heretofore, discussed were raised on the trial, but not so with this one. Now it is a well-settled principle of appellate practice that for a party to avail himself of error on appeal, it must have occurred in the trial without his express or implied consent, and he is estopped to allege as error that which he has recognized as valid by his voluntary act. In a recent case in our Supreme Court it is asserted that he will not be permitted to change his position on appeal and require formal proof on a question practically admitted in the court below. [Meyer Bros. Drug Co. v. Bybee, 179 Mo. 354-369, 78 S. W. 579.] Otherwise the trial court would constantly be adjudged in error on matters tacitly passed over, as proper or impliedly conceded by the parties on which it had not been called upon to give an opinion, and this the law will not forbear. Authorities are numerous. [Hilz v. Railroad Co., 101 Mo. 36, 13 S. W. 946; Hudson v. Railroad Co., 101 Mo. 13, 14 S. W. 15; Zeliff v. Schuster, 31 Mo. App. 493; Gale v. State Ins. Co., 33 Mo. App. 664; Harrington v.

Sedalia, 98 Mo. 583, 12 S. W. 342; Gale v. Missouri Car, etc., Co., 177 Mo. App. 427, 76 S. W. 987; North St. Louis, etc., Co. v. Obert, 169 Mo. 507, 69 S. W. 1044; Mirrieless v. Railroad, 163 Mo. 470, 63 S. W. 718; Heman v. Larkin, 108 Mo. App. 392, 83 S. W. 1019; Womach v. City of St. Joseph, 168 Mo. 236, 67 S. W. 588; Phelps v. City of Salisbury, 161 Mo. 1, 61 S. W. 582; Dice v. Hamilton, 178 Mo. 81, 77 S. W. 299; McDonald v. Tittman, 96 Mo. App. 536, 70 S. W. 502; Krup v. Corley, 95 Mo. App. 640, 69 S. W. 609; Ency. Pl. and Pr., 516.]

Finding no reversible error in the record, the judgment will be affirmed. It is so ordered. *Bland, P. J.,* and *Goode, J.,* concur.